68 *Railroad Ventures, et al. v. Surface Transp. Bd., et al.* Nos. 00-3261/3275/3317/ 4303/4345/4346/4435; 01-3090/3091

conduct of the parties appearing before it.") (citing *Checkosky v. SEC*, 23 F.3d 452, 455 (D.C. Cir. 1994) (Silberman, J., concurring); *Touche Ross & Co. v. SEC*, 609 F.2d 570 (2d Cir. 1979)); *see also Peters v. Union Pac. R. Co.*, 80 F.3d 257, 263 (8th Cir. 1996) (describing one purpose of administrative exhaustion requirement as allowing agency to discourage parties' disregard of processes and procedures). Thus, we cannot find that the STB acted arbitrarily in voiding RVI's transfer of surface rights in 4.012 acres of the line to the Park District.

### CONCLUSION

Accordingly, we conclude that the STB had jurisdiction to approve the sale of the rail line and that its October 4, 2000 decision approving the sale was not erroneous to the extent that it ordered RVI to transfer its entire fee simple interest in the property constituting the rail line that was the subject of RVI's abandonment petition. Further, we find the STB's decisions to lower the salvage value of the track and materials and to order RVI to escrow $375,000 of the sale proceeds to pay for track restorations and repairs were not arbitrary or capricious. The STB also did not err in voiding the "Grade Separated Crossing Settlement Agreement" ("GSCSA") entered into between RVI and Boardman Township and RVI's transfer of surface rights in 4.012 acres of the line to the Park District. For the reasons set forth above, we therefore **AFFIRM** the decisions of the STB.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0259P (6th Cir.)
File Name: 02a0259p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

RAILROAD VENTURES, INC.
(00-3261/3317/4303/4435;
01-3090/3091), BOARDMAN
TOWNSHIP, OHIO
(00-3275/4345), and
BOARDMAN TOWNSHIP PARK
DISTRICT (00-4346),
      *Petitioners,*

    *v.*

SURFACE TRANSPORTATION
BOARD and UNITED STATES
OF AMERICA,
      *Respondents,*

COLUMBIANA COUNTY PORT
AUTHORITY and CENTRAL
COLUMBIANA &
PENNSYLVANIA RAILWAY,
INC.,
      *Intervenors.*

Nos. 00-3261/
3275/3317/4303/
4345/4346/4435;
01-3090/3091

On Petitions for Review of Orders of
the Surface Transportation Board.
No. AB 556.

1

Argued:  January 30, 2002

Decided and Filed:  August 1, 2002

Before:  GUY and CLAY, Circuit Judges; NUGENT,[*]
District Judge.

_____

**COUNSEL**

**ARGUED:**  R. Joseph Parker, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, Christopher C. Russell, PORTER, WRIGHT, MORRIS & ARTHUR, Columbus, Ohio, for Petitioners.  Cecelia H. Cannizzaro, SURFACE TRANSPORTATION BOARD, Washington, D.C., for Respondents.  **ON BRIEF:**  R. Joseph Parker, John B. Nalbandian, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, Richard R. Wilson, Altoona, Pennsylvania, Christopher C. Russell, PORTER, WRIGHT, MORRIS & ARTHUR, Columbus, Ohio, for Petitioners.  Cecelia H. Cannizzaro, SURFACE TRANSPORTATION BOARD, Washington, D.C., John P. Fonte, Robert B. Nicholson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents.  Keith G. O'Brien, REA, CROSS & AUCHINCLOSS, Washington, D.C., Richard H. Streeter, BARNES & THORNBURG, Washington, D.C., for Intervenors.

_____

[*] The Honorable Donald C. Nugent, United States District Judge for the Northern District of Ohio, sitting by designation.

**6.    The STB did not err in voiding RVI's transfer of surface rights in 4.012 acres of the line to the Park District**

The Park District also challenges the portion of the STB's October 4, 2000 decision invalidating its November 8, 1999 purchase of surface rights to 4.012 acres of the line from RVI, claiming that the STB acted in an unreasonable and inconsistent manner in voiding its purchase, particularly because the STB refused CCPA's initial request to reject the sale in its January 7, 2000 decision, finding "no evidence of record of a binding agreement that could obstruct future rail operations."

As with the GSCSA, RVI entered into this agreement with the Park District after it filed its petition seeking to abandon the rail line.  Accordingly, we uphold the STB's order invalidating this agreement on the ground that RVI had no legal authority on November 8, 1999 to convey property interests associated with the rail line.

Alternatively, the STB did not act arbitrarily or capriciously in invalidating the purchase of 4.012 acres.  While the STB initially concluded in its January 7, 2000 decision that the transfer to the Park District would not harm CCPA's intended rail operations, it reached the opposite conclusion in its October 4, 2000 because of RVI's conduct in the OFA process.  Here, it was within the STB's authority to change its position and conclude that CCPA required a full fee interest in the line, including the 4.012-acre portion that RVI sold to the Park District.  *See, e.g., Unbelievable, Inc. v. N.L.R.B.*, 118 F.3d 795, 812 (D.C. Cir. 1997) (Wald, J., dissenting) ("Inherent in any agency's authority to carry out its designated functions is the power to ensure the fairness, efficiency and integrity of its processes and the appropriateness of the

_____

track was not preempted by the FRSA).

customers were required to endure long delays in getting to their nursery when the primary access road was blocked by waiting trains. Finding that "[t]he language of the statute could not be more precise, and it is beyond peradventure that regulation of KCS trains operations, as well as the construction and operation of the KCS side tracks, is under the exclusive jurisdiction of the STB unless some other provision in the ICCTA provides otherwise," the Fifth Circuit in *Friberg* held that the plaintiffs' common claims of negligence were preempted by the ICCTA. 267 F.3d at 443-44.

In the present case, it is manifestly clear that Congress intended to preempt the Ohio state statutes, and any claims arising therefrom, to the extent that they intrude upon the STB's exclusive jurisdiction over "transportation by rail carriers" and "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State." 49 U.S.C. § 10501(b). Although Boardman Township claims that the purpose of the GSCSA was to comply with the requirements of the Ohio statutes, § 10501(b) has preemptive effect to the extent that these state statutes conflict with federal law. *Cipollone*, 505 U.S. at 516 (citing *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)).[15]

---

[15] Because the parties have not raised the matter, we need not address whether the Ohio statutes at issue are preempted by the Federal Railroad Safety Act (FRSA), 49 U.S.C. §§ 20101-20153. *See CSX Transp. Inc. v. City of Plymouth*, 283 F.3d 812, 817 (6th Cir. 2002) (noting that the FRSA preempted the Michigan statute prohibiting trains from continuously blocking grade crossings for more than five minutes, while declining to address whether the statute was preempted by § 10501(b) of the ICCTA); *cf. Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517 (6th Cir. 2001) (finding that the district court erred in concluding that Ohio track clearance regulation was preempted by § 10501(b), holding that the Ohio rule requiring at least fourteen feet of clearance between the centers of

---

## OPINION

---

CLAY, Circuit Judge. Petitioners, Railroad Ventures, Inc. ("RVI"), Boardman Township ("Boardman Township"), and Boardman Township Park District ("the Park District") seek review of several orders issued throughout the year 2000 by Respondent Surface Transportation Board ("the STB") during the course of a sale by RVI to Intervenor Columbiana County Port Authority ("CCPA") of a 35.7-mile rail line ("the rail line") extending from milepost 0.0 at Youngstown, Ohio to milepost 35.7 at Darlington, Pennsylvania, with a connecting one-mile segment near Negley, Ohio, pursuant to 49 U.S.C. § 10904. CCPA is a quasi-public agency established by the Board of County Commissioners of Columbiana County, Ohio. The other intervenor, Central Columbiana & Pennsylvania Railway, Inc., ("CCPR"), a wholly owned subsidiary of the Arkansas Short Line Railroads, Inc., has a lease to operate the rail line. The sale occurred after RVI, which acquired the rail line from Youngstown & Southern Railroad on November 8, 1996, submitted an application to the STB for exemption from certain regulations, pursuant to 49 U.S.C. § 10502, and for authority to abandon the rail line pursuant to 49 U.S.C. § 10903(a). For the reasons set forth below, we **AFFIRM** the STB's orders.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

Congress has regulated the abandonment of railroad lines since the second decade of the last century when it entrusted the Interstate Commerce Commission ("the ICC") with jurisdiction over such abandonments pursuant to the

4     *Railroad Ventures, et al.*     Nos. 00-3261/3275/3317/
     *v. Surface Transp. Bd.,*      4303/4345/4346/4435;
     *et al.*      01-3090/3091

Transportation Act of 1920, 41 Stat. 477-78.[1] To expedite the abandonment process, Congress modified the Interstate Commerce Act with the enactment of the Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), Pub. L. No. 94-210, 90 Stat. 31 (1976), which added a provision, 49 U.S.C. § 10905 (now 49 U.S.C. § 10904), that suspended abandonment of a line for up to six months to allow time for a prospective purchaser to consummate the

---

[1]Pursuant to the Interstate Commerce Act of 1887, 24 Stat. 379 (1887), Congress created the ICC to regulate railroads. *See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 318 (1981) (recognizing the Interstate Commerce Act as "among the most pervasive and comprehensive of federal regulatory schemes"); *United States v. Baltimore & O.R. Co.,* 333 U.S. 169, 175 (1948) ("The Interstate Commerce Act is one of the most comprehensive regulatory plans that Congress has ever undertaken."); *MidAmerican Energy Co. v. STB*, 169 F.3d 1099, 1105 (8th Cir. 1999) (noting that "the Interstate Commerce Act provided for a strict regulatory framework to govern the federal railroad industry"); *City of Auburn v. United States,* 154 F.3d 1025, 1029 (9th Cir. 1998) (noting that "Congress' authority to regulate railroads is well established").

Initially, the Interstate Commerce Act did not subject railroad abandonments to the jurisdiction of the ICC. *See Hayfield,* 467 U.S. at 628. However, with the passage of the Transportation Act of 1920, Congress sought to preempt actions by state and local authorities that prevented railroads from abandoning unprofitable lines. *RLTD Ry. Corp. v. STB*, 166 F.3d 808, 810 (6th Cir. 1999) (noting that "Congress sought to balance the railroad companies' need to dispose of trackage that was no longer profitable with the public's need for a working interstate track system")(citing Steven R. Wild, *A History of Railroad Abandonments*, 23 Transp. L.J. 1, 5 (1995) and *Colorado v. United States*, 271 U.S. 153, 168-69 (1926)). For the most part from 1920 until 1976, Congress set no time limit for abandonments. *See Hayfield,* 467 U.S. at 628 (1984)(noting that "[r]ailroads consequently found themselves enmeshed in lengthy proceedings" while attempting to "unburden themselves promptly of unprofitable lines"); *Consol. Rail Corp. v. STB*, 93 F.3d 793, 794 (D.C. Cir. 1996) ("For most of this period, Congress set no time limit for abandonment proceedings.").

Nos. 00-3261/3275/3317/     *Railroad Ventures, et al.*    65
4303/4345/4346/4435;      *v. Surface Transp. Bd.,*
01-3090/3091      *et al.*

49 U.S.C. § 10501(b). As explained by the Ninth Circuit in *City of Auburn v. United States*, 154 F.3d 1025, 1030 (9th Cir. 1998):

> Section 10501 of the ICCTA, which governs the STB's jurisdiction, states the [B]oard will have *exclusive* jurisdiction over "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State." 49 U.S.C. § 10501(b)(2) (1997). The same section states that "the remedies provided under this part with respect to regulation of rail transportation are *exclusive* and *preempt* the remedies provided under Federal or State law." 49 U.S.C. § 10501(b) (1997). . . . The section unambiguously states: "The authority of the Board under this subchapter is *exclusive*." *Id*.

154 F.3d at 1030 (emphasis in original).

In *City of Auburn*, the Ninth Circuit, endorsing a "broad reading of Congress' preemption intent, not a narrow one," rejected the City's argument that Congress, through the ICCTA, only intended preemption of economic regulation of the railroads. Finding that Congressional intent was clear and that preemption of rail activity is a valid exercise of Congressional power under the Commerce Clause, the Ninth Circuit affirmed the STB's finding that state and local environmental review laws were preempted pursuant to § 10501(b)(2).

The Fifth Circuit has also found preemption under 49 U.S.C. § 10501(b). In *Friberg*, 267 F.3d at 439, the Fifth Circuit ruled that suits against the railroad (KCS) for negligence were preempted by federal law under 49 U.S.C. § 10501(b). In that case, the plaintiffs, who operated a landscape nursery, alleged that they lost business and eventually were forced to close their business because their

state law so conflict that it is impossible for a party to comply with both simultaneously, or where enforcement of state law prevents the accomplishment of the full purposes and objectives of federal law. *See Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516 (1992); *Friberg v. Kansas City S. Ry. Co.,* 267 F.3d 439, 442 (5th Cir. 2001). "If the statute contains an express preemption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *CSX Transp. Inc. v. Easterwood,* 507 U.S. 658, 664 (1993). Although there is a presumption under the Supremacy Clause that Congress did not intend to preempt state law, "an assumption of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke,* 529 U.S. 89, 108 (2000).

As set forth in 49 U.S.C. § 10501(b):

(b) The jurisdiction of the Board over--

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

acquisition of a rail line from an abandoning carrier.[2] *See Hayfield N. R.R. v. Chicago & N.W. Transp. Co.,* 467 U.S. 622, 628 (1984). The Interstate Commerce Act was further amended by the passage of the Staggers Rail Act of 1980, Pub. L. No. 96-448, 94 Stat. 1895 (1980), which added a forced-sale provision to the former 49 U.S.C. § 10905, allowing the ICC to set the price and other terms of sale when a party to the sale requested it. *Id.* at 630 ("The underlying rationale of § 10905 represents a continuation of Congress' efforts to accommodate the conflicting interests of railroads that desire to unburden themselves quickly of unprofitable lines and shippers that are dependent upon continued rail service."); *GS Roofing Prods. Co. v. STB,* 262 F.3d 767, 771 (8th Cir. 2001) ("*GS Roofing II*) ("The Staggers Rail Act of 1980, now codified at 49 U.S.C. § 10907, was enacted to address concerns about the deteriorating rail service provided on some of the secondary railroad lines throughout the country."); *Consol. Rail Corp. v. ICC,* 29 F.3d 706, 712 (D.C. Cir. 1994) (noting that the purpose of the forced-sale

---

[2]The objectives of the present 49 U.S.C. § 1094 (the former 49 U.S.C. § 10905) are to preserve rail service for shippers over a line that would otherwise be abandoned, while permitting the owner of an unprofitable rail line to sell it promptly for its fair market value. *See Railroad Transportation Policy Act of 1979: Hearings on S.1946 before the Senate Comm. on Commerce, Science, and Transportation, S. Rep. No 96-470 at 39-41,* 96th Cong., 1st Sess. 40 (1979) (noting that this section "sets up a procedure where rail lines approved for abandonment may be purchased or subsidized in order to continue rail service"); *H.R. Rep. No. 96-1430 at 125,* 96th Cong., 2d Sess. 125 (1980), *reprinted* in 1980 U.S.C.C.A.N. at 3978, 4157 (noting that this section will "assist shippers who are sincerely interested in improving rail service, while at the same time protecting carriers from protracted legal proceedings which are calculated merely to tediously extend the abandonment process").

6    *Railroad Ventures, et al.*    Nos. 00-3261/3275/3317/
    *v. Surface Transp. Bd.,*    4303/4345/4346/4435;
    *et al.*    01-3090/3091

provision is "not simply the maintenance of rail *lines*, but the continuation of rail *service*") (emphasis in original).[3]

After the ICC ceased to exist, effective January 1, 1996, pursuant to the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. §§ 10101-16106 (1997) ("the ICCTA"), authority over the abandonment of railroad lines passed to the Surface Transportation Board ("the STB"). *See* 49 U.S.C. § 10903; *GS Roofing II,* 262 F.3d at 773; *MidAmerican Energy Co. v. STB*, 169 F.3d 1099, 1104 n. 8 (8th Cir. 1999); *RLTD Ry. Corp. v. STB*, 166 F.3d 808, 810 (6th Cir. 1999); *Consol. Rail Corp. v. STB*, 93 F.3d 793, 794 (D.C. Cir. 1996) (noting that "many functions of the ICC, including authority over abandonment proceedings were transferred to the STB in the Department of Transportation"). The STB is now the federal agency with exclusive jurisdiction over transportation by railroad. *Friends of the Atglen-Susquehanna Trail, Inc. v. STB*, 252 F.3d 246, 250 n.1 (3d Cir. 2001) (citing 49 U.S.C. § 10501(a)(1)). Thus, if a railroad line falls within its jurisdiction, the STB's authority over abandonment is both exclusive and plenary. *See Preseault v. ICC,* 494 U.S. 1, 8 (1990) (citing *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 321 (1981); *RLTD Ry. Corp.*, 166 F.3d at 808.

In addition, most of the provisions of the former Interstate Commerce Act were reenacted in the ICCTA. *MidAmerican,* 169 F.3d at 1104 n. 8. Specifically, the ICCTA recodified the former § 10905 as § 10904, amending the statute to limit the period in which the STB set the terms and conditions of the forced sale to thirty days and the duration of any subsidy for

---

[3]In *Preseault v. ICC,* 494 U.S. 1, 5 (1990), the Court noted that Congress expressed concern about "the shrinking rail trackage." 494 U.S. at 5. As noted by Justice Brennan: "In 1920, the Nation's railway system reached its peak of 272,000 miles; [in 1990] only about 141,000 miles [were] in use, and experts predict that 3,000 miles will be abandoned every year through the end of this century." *Id.*

Nos. 00-3261/3275/3317/    *Railroad Ventures, et al.*    63
4303/4345/4346/4435;    *v. Surface Transp. Bd.,*
01-3090/3091    *et al.*

from its interpretation of two provisions of the OFA statute: the common carrier obligations of § 10904(f)(4)(A) and the STB's authority to set the terms and conditions of a forced sale pursuant to § 10904(f)(1). Section 10904(f)(4)(A) bars a purchaser of a rail line from transferring or discontinuing service during the two years after the purchase, and restricts the purchaser from transferring the line to anyone but the seller for a five-year post-sale period. Thus, the STB acted within its authority when it recognized that the GSCSA impeded a line owner's ability to perform rail operations by conditioning a line owner's full resumption of service with the obligation to complete the projected improvements set forth in the agreement. It was also reasonable for the STB to view the provisions of the GSCSA as an intrusion onto its § 10904(f)(1) authority to fix the terms and conditions of an OFA sale. Noting that "section 10904 represents a clear legislative determination that rail service should be preserved whenever there is an offeror willing to provide for continued service," the STB did not act unreasonably in voiding the GSCSA to the extent it imposed obligations on parties other than Boardman Township and RVI, and to the extent it required construction of an overpass or underpass before the resumption of rail service. Because the STB has acted rationally and in accordance with law, we therefore affirm the order voiding the GSCSA.

Finally, we note that the ICCTA preempts the Ohio state statutes in question to the extent that they intrude upon the jurisdiction of the STB with regard to the regulation of rail transportation under § 10501(b). Under the Supremacy Clause, U.S. Const. art. 6, cl. 2, federal law preempts state or local law in various ways: (1) express preemption where the intent of Congress to preempt state law is clear and explicit; (2) field preemption where Congress' regulation of a field is so pervasive or the federal interest is so dominant that an intent can be inferred for federal law to occupy the field exclusively; and (3) conflict preemption, where federal and

is reactivated for rail service to submit the plans ". . . and metes and bounds descriptions of any property to be appropriated for the construction of the Crossing Project . . . ," a later provision overrides the time period and requires, among other things, completion of the project and submission to [Boardman Township] of a 2-year maintenance bond on the improvements, before rail service can be resumed in full.

*R.R. Ventures*, 2000 WL 1125904, at *2.

On appeal, Boardman Township challenges the STB's decisions declaring the GSCSA void and unenforceable against CCPA, claiming that the purpose of the GSCSA was not to interfere with rail operations, but to secure the health, safety, and well-being of the residents of Boardman Township pursuant to Ohio Rev. Code § 519.02, and to avoid the imposition of liability on political subdivisions "for injury, death, or loss to persons or property caused by their failure to keep public roads, highways, streets, avenues, alleys, sidewalks, bridges, aqueducts, viaducts, and public grounds within the political subdivisions open, in repair, and free from nuisance" under Ohio Rev. Code § 2744.02(B)(3). Boardman Township contends that the STB's goal of continued rail service, where appropriate, should not wholly displace its concerns for public safety and its duty to its citizens arising under state law.

At the outset, we note that Boardman Township entered into the GSCSA with RVI on November 5, 1999. Because RVI had no legal right to transfer any property interests associated with the rail line after filing its abandonment petition, we thereby uphold the STB's invalidation of the GSCSA agreement.

In addition, we note that the STB acted within its authority by invalidating the agreement on public policy grounds. Here, the STB's decision to invalidate the GSCSA stemmed

continued rail service. *See Nat'l Ass'n of Reversionary Prop. Owners v. STB*, 158 F.3d 135, 140 (D.C. Cir. 1998) (noting that "[t]he ICCTA made some changes to the abandonment application process, such as eliminating the processing timetable and requiring that offers of financial assistance [OFA] be filed within four months of an abandonment application, *see* 49 U.S.C. § 10904(c)").

A rail carrier providing transportation subject to the jurisdiction of the STB may abandon its railroad line or discontinue the operation of all rail transportation over its railroad line only as authorized under the statute. 49 U.S.C. § 10903(a)(1).[4] To abandon a railroad line or discontinue operation of rail service on a rail line, a rail carrier must file an application with the STB seeking prior approval or an exemption. 49 U.S.C. § § 10502(a), 10903(a)(1)(A); 49 C.F.R. §§ 1152.50, 1152.60; *see Friends of the Atglen-Susquehanna Trail,* 252 F.3d at 251 ("A rail carrier intending to abandon, and to be released from its obligations to retain or operate, any part of its railroad lines must file an application to do so with the STB and such abandonment must adhere to certain established procedures."). A line owner may "abandon any part of its railroad lines," 49 U.S.C. § 10903(d)(1), but cannot do so without the permission of the STB. 49 U.S.C.§ 10903(a)(1)(A); *see Kulmer and Schumacher v. STB*, 236 F.3d 1255, 1256 (10th Cir. 2001)

_____

[4]Pursuant to 49 U.S.C. § 11101(a), railroads, as common carriers, have an obligation to provide rail service upon reasonable request, but "the common carrier obligation is not absolute." *GS Roofing II,* 262 F.3d at 773. Abandonment consists of "a permanent or indefinite cessation of rail service, which terminates a rail carrier's public service obligation." *Gibbons v. United States*, 660 F.2d 1227, 1234 (7th Cir. 1981). "An abandoned railroad corridor is one that is no longer used for rail service and is removed from the national transportation system." *Nat'l Ass'n of Reversionary Prop. Owners*, 158 F.3d at 137 n.1 (citing *Presault*, 494 U.S. at 6 n.3). "A line that is no longer in use, but has been officially abandoned, may be reactivated later and is termed 'discontinued.'" *Id.*

("Rail carriers must obtain STB authorization to abandon rail service over their lines."); *GS Roofing Prods. Co. v. STB*, 143 F.3d 387, 391 (8th Cir. 1998) ("*GS Roofing I*"); *Ethan Allen. Inc. v. Maine Cent. R.R. Co.*, 431 F. Supp. 740, 742-43 (D.Vt. 1977) (noting that "the quasi-public nature of railroads entails a higher degree of public responsibility than is required of most private companies"). A rail line owner is generally obligated to maintain a diagram of the rail system it operates, and if the owner wishes to abandon, it must "identify each railroad line for which the rail carrier plans to file an application to abandon." 49 U.S.C. § 10903(c)(2)(B). 49 C.F.R. § 1152.22(a)(4) further specifies that the information comprising the abandonment application include:

> [a d]etailed map of the subject line on a sheet not larger than 8x10 ½ inches, drawn to scale, and with the scale shown thereon. The map must show, in clear relief, the exact location of the rail line to be abandoned or over which service is to be discontinued and its relation to other rail lines in the area, highways, water routes, and population centers.

49 C.F.R. § 1152.22(a)(4).

The STB authorizes line abandonments in two ways. *Redmond-Issaquah Ry. Pres. Ass'n v. STB*, 223 F.3d 1057, 1059 n. 2 (9th Cir. 2000). First, the STB may permit the abandonment of a railroad line by a rail carrier or the discontinuance of rail service if it finds that present or future public convenience and necessity supports such abandonment or discontinuance. 49 U.S.C. § 10903(d)(2). To implement this standard, the STB balances the potential harm to affected shippers and communities against the present and future burden that continued operations would impose on the railroad and on interstate commerce. *See Colorado v. United States*, 271 U.S. 153, 168-69 (1926); *Redmond-Issaquah,* 223 F.3d at 1059 (noting that "Congress sought to balance the railroad companies' need to manage its tracks in an

**5.  The STB did not err in voiding the "Grade Separated Crossing Settlement Agreement" ("GSCSA") entered into between RVI and Boardman Township**

In its January 7, 2000 decision, the STB granted CCPA's request to declare the GSCSA unenforceable against it, finding that enforcement of the GSCSA against CCPA would unreasonably interfere with CCPA's purchase of the rail line and its future fulfillment of common carrier obligations. The STB reiterated these conclusions in its October 4, 2000 decision, denying Boardman Township's request for a stay pending appeal of the January 7, 2000 decision. In both decisions, the STB viewed the GSCSA as contrary to the public interest in continued rail service. The STB's January 7, 2000 decision provides a summary of the provisions of the GSCSA:

> Specifically, the [GSCSA] states that "RVI or its successors and assigns (hereinafter referred to as '*Line Owner*') agree to undertake the necessary planning, construction, and future maintenance of a grade separated crossing at State Road 224 and at other such road crossings as may be determined by [Boardman Township] . . . ." Designating it as the "Crossing Project" the [GSCSA] requires the Line Owner, within 3 months from the date the line is reactivated for continued rail service, to prepare and submit for the approval of [Boardman Township] and various state authorities detailed plans and cost estimates for the acquisition of additional property necessary for the construction of the new grade separated crossing, including adjustments to the public highway, which will carry the rail line over or under Route 224 and other designated road crossings. According to the [GSCSA], the Line Owner is responsible for all the costs and expenses associated with the Crossing Project. While these specific terms state that the Line Owner has 3 months from the date the line

Kovalchick contract initially and it should not be able to profit from withholding information pertinent to the OFA process. To hold otherwise would be to reward RVI for undermining the integrity of the OFA process. Moreover, we note that RVI does not contend that the Kovalchick contract is unenforceable or that RVI would be able to sell the track to anyone other than Kovalchick. Therefore, the STB provided a reasoned explanation for revaluing the track and materials in accordance with the terms of the Kovalchick contract.

### b. Escrow of Funds for Repairs

RVI also challenges the STB's action in the October 4, 2000 decision requiring CCPA to place $375,000 of the purchase price in an escrow account to ensure that RVI paid for restorations to the track and signals. The STB ordered the creation of the escrow account because RVI had authorized state workers to pave over parts of the track and damage signals during its ownership of the embargoed line. RVI argues that the escrow order was arbitrary because it was not under a legal obligation to maintain the line for common carrier operations due to its embargo status at the time that RVI authorized the pavement of parts of the line and the disconnection of signals. RVI also claims that the STB's escrow order was an unwarranted punitive measure.

RVI fails to demonstrate that the STB's decisions in this regard were arbitrary. Although RVI was not obligated to provide service on the line during the pendency of the embargo, s*ee GS Roofing I*, 143 F.3d at 391, the STB acted reasonably in finding that RVI had an obligation to pay for any damage to the line. Further, the record shows that, in a series of letters from RVI Project Manager Dennis Matey to state and local officials in Ohio, RVI acknowledged that it would be responsible for any repair and reconnection costs. Considering RVI's conduct since acquiring the rail line, the STB, quite wisely, required an escrow of funds to repair the damage to the track done with RVI's authorization.

economically efficient manner with the public's need for a functioning interstate railroad system"). The STB may also authorize an abandonment by granting an exemption from the certification process. *See* 49 U.S.C. § 10502(a). However, once a rail line has been properly abandoned, the STB loses jurisdiction. *Preseault*, 494 U.S. at 5 n. 3; *RLTD Ry. Corp.*, 166 F.3d at 814; *Consol. Rail Corp.*, 93 F.3d at 797.

The ICCTA provides for offers of financial assistance (OFA) to avoid the abandonment of rail lines, 49 U.S.C. § 10904; 49 C.F.R. § 1152.27, and for the sale, subject to conditions imposed by the STB, of abandoned rail properties that are appropriate for public use. 49 U.S.C. § 10905. Section 10904(b) directs a rail carrier seeking authority to abandon a line pursuant to 49 U.S.C. § 10903 to provide promptly to a party considering an OFA a report on the physical condition of "that part of the railroad line involved in the proposed abandonment;" the traffic, revenue, and other data necessary to determine the amount of annual financial assistance needed "to continue rail transportation over that part of the railroad line;" and an estimate of the minimum purchase price required "to keep the line or a portion of the line in operation." 49 U.S.C. § 10904(b).

The OFA provisions of the statute guarantee any "financially responsible" party the right to acquire a rail line to provide for continued rail service. 49 U.S.C. § 10904. Under § 10904(c), a prospective OFA purchaser "may offer to subsidize or purchase the railroad line that is subject of" an abandonment application. *Kulmer*, 236 F.3d at 1256 ("The OFA provisions create a four-month waiting period wherein 'any person may offer to subsidize or purchase the railroad line that is the subject' of an abandonment application. § 10904(c)."). A party must file its OFA within ten days of a decision from the STB granting a petition for abandonment or exemption. 49 U.S.C. § 10904(c); 49 C.F.R. § 1152.27(c)(1)(i)(B). After a prospective purchaser has "offered financial assistance regarding that part of the railroad

10     *Railroad Ventures, et al.*     Nos. 00-3261/3275/3317/
       *v. Surface Transp. Bd.,*       4303/4345/4346/4435;
       *et al.*                    01-3090/3091

line to be abandoned or over which rail transportation is to be discontinued," 49 U.S.C. § 10904(d)(1) obligates the STB to decide if the prospective purchaser is "financially responsible." Under 49 U.S.C. § 1097(a), a "financially responsible person" is defined to be:

a person who –

(1) is capable of paying the constitutional minimum value of the railroad line proposed to be acquired; and

(2) is able to assure that adequate transportation will be provided over such line for a period of not less than 3 years.

49 U.S.C. § 10907(a). If a party files a timely OFA, and the STB finds that the party is "financially responsible," then the STB must postpone the abandonment of the line. 49 U.S.C. § 10904(d)(2).

Postponement of abandonment remains in effect until the line owner and the prospective OFA purchaser (offeror) have come to an agreement on the terms of sale, or until the STB sets the terms of sale upon the request of either the line owner or purchaser. 49 U.S.C. § 10904(d)(2)-(f). Pursuant to 49 C.F.R. § 1152.27(h)(3), "[t]he offeror has the burden of proof as to all issues in dispute." *See Iowa Terminal Ry. Co. v. ICC*, 853 F.2d 965, 969 (D.C. Cir. 1988) (noting that the buyer "must present sufficient evidence of the line's value to meet that burden"). When setting the terms and conditions of a sale of a rail line, the STB cannot set a price lower than the "fair market value of the line." 49 U.S.C. § 10904(f)(1)(B). Under § 10907(b)(2), the "constitutional minimum value of a particular railroad line shall be presumed to be not less than the net liquidation value of such line or the going concern value of such line, whichever is greater." 49 U.S.C. § 10907(b)(2); 49 C.F.R. § 1152.27(h)(6); *GS Roofing II*, 262 F.3d at 771 (noting that "Congress authorized the Board,

Nos. 00-3261/3275/3317/     *Railroad Ventures, et al.*    59
4303/4345/4346/4435;        *v. Surface Transp. Bd.,*
01-3090/3091                           *et al.*

**4. The STB's decisions to lower the salvage value of the track and materials and to order RVI to escrow $375,000 of the sale proceeds to pay for track restorations and repairs were not arbitrary or capricious**

**a. Downward Revaluation of Track and Materials**

RVI challenges two other actions of the STB in its October 4, 2000 decision. First, RVI contends that the STB acted arbitrarily by revaluing the track and materials. In its January 7, 2000 decision, the STB based its initial track valuation on a firm offer from A&K Railroad Materials, Inc. to buy and remove the track for $788,560. The STB reduced this amount by $58,000 to reflect needed restorations in grade crossings, arriving at a net salvage value of $730,560. Several months later, the STB revisited its track and materials valuation, after receiving new evidence from CCPA. Between the January 7 and October 4, 2000 decisions, CCPA submitted evidence of RVI's 1996 contract selling the track salvage rights to Kovalchick for $400,000. The STB decided that the 1996 sale nullified subsequent firm purchase offers, and that the value of the track could not exceed the amount RVI had received according to contract.

Contrary to RVI's contention, the STB's decision to reduce the salvage value was not arbitrary or capricious. Although RVI maintains that the STB acted arbitrarily in limiting the track salvage value to the $400,000 amount received from the Kovalchick contract because the contract with Kovalchick did not concern the fair market value of the track in 2000, and because the contract with Kovalchick included a deeply discounted salvage value based on the STB's future abandonment authorization, the STB properly points out that RVI would not have been able to sell the track for any more than it had received in 1996. Further, the STB justifies its track revaluation, as stated in the October 4, 2000 decision, on the ground that RVI failed to come forward with the

assembled corridor." *R.R. Ventures*, 2000 WL 1470451, at *9. *See Portland Traction Co. – Abandonment Exemption – in Multnomah & Clackmas Counties*, Docket No. AB-225 (Sub-No. 2X), 1990 WL 287141, at *4 (Decided Jan. 4, 1990) (accepting corridor valuation on the basis of an executed sales contract).

In deciding the valuation issue, we are constrained by the narrow standard of review applicable to agency decisions, which generally requires affirmance of the STB's valuation decisions. As noted in *Iowa Terminal*:

> In considering each element of the valuation order, we are mindful that the [STB's] decision "must be upheld if, based on the record before it, the [STB's] decision is not arbitrary or capricious." *Illinois Cent. Gulf R.R. Co. v. ICC*, 717 F.2d 408, 412 (7th Cir. 1983). While we may not substitute our judgment for that of the agency, we must nevertheless satisfy ourselves that the [STB] considered all relevant factors and provided a reasoned explanation for its decision.

*Iowa Terminal*, 853 F.2d at 969 (citing *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43). Applying this narrow standard of review, we find that the STB did not act in an arbitrary or capricious fashion by refusing to credit all of RVI's corridor valuation evidence. As the STB points out in its arguments to this Court, the STB is under a limited statutory time frame (thirty days) in which to make a determination of the fair market value of the line. To make a reasoned determination, the STB must establish guidelines for considering and crediting valuation evidence. In this case, we believe that the STB, by requiring signed sales contracts or binding purchase offers as evidence of a corridor value for all or part of a line, has made a reasoned and workable choice.

under particular circumstances, to force the sale of a railroad line at its 'constitutional minimum value' to a 'financially responsible person'").

49 U.S.C. § 10904(f)(2) gives an offeror ten days in which to withdraw the offer to purchase a rail line following a decision of the STB setting the terms of the sale. *See also* 49 C.F.R. § 1152.27(h)(7). By statute, only the offeror is authorized to withdraw from the terms of a STB-directed sale. 49 U.S.C. § 10904(f)(2). Without a withdrawal by the offeror within the ten-day period, the STB's decision becomes binding on both parties. 49 U.S.C. § 10904(f)(2); *Kulmer*, 236 F.3d at 1256 ("If the STB finds that an offer meets certain criteria, the railroad is forced to sell the line to the offeror according to the terms negotiated by the parties or, when necessary, terms imposed by the STB."). Once the rail line has been acquired, the purchaser may not discontinue service for at least two years. 49 U.S.C. § 10904(f)(4)(A); *Nat'l Ass'n of Reversionary Prop. Owners,* 158 F.3d at 138 n.4 (noting that abandonment authorization in accordance with the exemption procedures under § 10502 is available "when no local traffic has run on the line in at least two years").

## B. Statement of Facts

These consolidated cases involve a 35.7 mile railroad line running from Youngstown, Ohio to Darlington, Pennsylvania, with a connecting one-mile segment near Negley, Ohio. Without the authorization of the STB, RVI acquired the rail line in question from the former Youngstown and Southern Railroad Company for $730,000 on November 8, 1996. *See R.R. Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County, PA,* STB Docket No. AB-556 (Sub-No. 2X), 2001 WL 41202, at *1 (Service Date Jan. 17, 2001). Upon purchasing the line, RVI entered into a management agreement with OLE, Ltd. ("OLE"), whose managing member was David L. Handel, the

12    *Railroad Ventures, et al.*     Nos. 00-3261/3275/3317/
   *v. Surface Transp. Bd.,*     4303/4345/4346/4435;
   *et al.*     01-3090/3091

current president of RVI. Unbeknownst to the STB, RVI and OLE, under the management agreement, expressed their "intent to liquidate the property in whole or in part to maximize the cash flow potential to both parties," contemplating the complete removal of railroad track and ties, which the agreement termed "debris." *See R.R. Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County, PA,* STB Docket No. AB-556 (Sub-No. 2X), 2000 WL 1801264, at *1 (Service Date Dec. 7, 2000). To that end, RVI promptly sold the future right to salvage the line's tracks and materials to another company. RVI also immediately canceled the lease of the Ohio & Pennsylvania Railroad Company ("OPRC"), the only operator authorized to provide service on the line, thus terminating rail service for several shippers on the rail line, including Darlington Brick and Clay Products Company ("Darlington Brick") and Insul Products, Inc. ("Insul"). *R.R. Ventures*, 2001 WL 41202, at *1.

As a consequence, OPRC declared an embargo on November 19, 1996, stating the cancellation of its lease as the cause.[5] However, upon receiving complaints from Darlington Brick and Insul, the STB's Office of Compliance and Enforcement ("OCE") investigated the cessation of rail service. Thereafter, the STB reached an agreement with the parties for service to be restored, and the embargo was canceled. RVI also agreed to seek belated authority from the STB to acquire the line. However, on December 18, 1996, about one week after service on the line was restored, a weather-related washout occurred that again prevented rail

---

[5] "An embargo is 'an emergency measure placed in effect because of some disability on the part of the carrier which makes the latter unable properly to perform its duty as a common carrier.'" *GS Roofing I,* 143 F.3d at 392 (quoting *Chicago N.W. Ry. Co. v. Union Packing Co.*, 373 F. Supp. 734, 736-37 (D. Neb. 1974)).

Nos. 00-3261/3275/3317/     *Railroad Ventures, et al.*    57
4303/4345/4346/4435;     *v. Surface Transp. Bd.,*
01-3090/3091     *et al.*

a 20.6 acre (4.2 mile) easement to the Park District for $600,000, submitted by RVI initially in support of its assembled corridor valuation. While the STB did not explain why it had not included the Park District agreement in the first valuation decision, it nonetheless stated that "RVI's evidence sufficiently described the location of this land, and the signed sales contract was good evidence of the value of that real estate." The STB refused to credit any other evidence proffered by RVI in support of corridor valuation, particularly an 11.7-mile aerial easement RVI had earlier granted to Ohio Edison Company. RVI had included with its evidentiary submissions evidence of a land easement to First Energy Company covering the same tract, but the STB concluded that including that easement in the valuation would permit RVI to receive double compensation for the land. The STB also refused to consider evidence submitted by RVI pertaining to the sale of the four-acre parcel to the Park District, concluding that RVI had failed to distinguish its location from the 20.6-acre easement to the Park District, and easement proposals from three other entities. The STB concluded that RVI had showed only that the entities had obtained funding for trails, not that they had entered into an agreement with RVI.

Applying the proper burden of proof standard, the STB, in its January 7, 2000 decision, determined that RVI's evidence was less authoritative in comparison to CCPA's evidence. The STB explained that it did not ordinarily accept assembled-corridor valuation, absent executed sales contracts for the entire corridor. *See Boston & Maine Corp. – Abandonment – In Hartford & New Haven Counties, Conn.*, STB Docket No. AB-355 (Sub-No. 23), 1998 WL 348755, at *3 (Service Date July 1, 1998). In its October 4, 2000 decision, the STB further explained: "In setting terms and conditions of a sale under section 10904, we cannot credit speculative evidence, but rely upon firm bids (from a purchaser) or signed contracts in establishing the value of an

At the time the STB rendered its January 7, 2000 decision, RVI and CCPA produced estimates of land value according to two methodologies. RVI contended that the highest and best value of the land was as a single non-rail corridor, with a small number of purchasers obtaining easements or rights-of-way over segments of the corridor. (J.A. at 1085-1119.) CCPA proffered evidence of value according to the "across the fence" ("AFT") methodology: dividing the tract into a large number of parcels, valuing each parcel as if sold to owners of adjoining parcels, and totaling the values of the parcels. RVI's assembled corridor methodology produced a value of $1,472,930, while CCPA's "AFT" methodology estimated the land value at $450,000.

As between the two methodologies, the STB decided CCPA's approach was more appropriate. Specifically, the STB rejected RVI's assembled corridor methodology, explaining that "[u]nless there is a specific documented interest expressed by a potential purchaser of an intact corridor, we do not consider this to be an acceptable method of valuation for [net liquidation value] purposes." Although RVI proffered copies of purchase agreements from the Park District and Ohio Edison Company for trail and utility easements, the STB rejected RVI's estimate of value as insufficient because the agreements pertained to portions of the corridor, rather than the corridor as a whole. In contrast, the STB accepted CCPA's appraisal as "complete and adequately supported and its . . . values appropriately adjusted," describing the values stated in the appraisal as "reasonable based on the comparable sales data presented." Having accepted CCPA's evidence, and subtracting $100,000 to represent an assignment by RVI for lease and interest income, the STB reached a land value of $350,000.

Thereafter, in its October 4, 2000 decision, the STB revisited the land valuation. The STB decided to adjust the land value upward to include an executed sale agreement for

service on the line. *See R.R. Ventures, Inc. – Acquisition and Operation Exemption – Youngstown & S. Ry. Co.,* STB Finance Docket No. 33385, 1997 WL 392877, at *1 (Service Date July 15, 1997).

Thereafter, on January 3, 1997, RVI filed a notice of exemption invoking the class exemption provision at 49 C.F.R. 1150.31(a)(1) for retroactive authorization of its purchase of the rail line, stating that it had been unaware of the need to obtain the STB's approval to acquire the line and that it had purchased the line "for the purpose of conducting rail freight common carrier operations" on it.[6] In response, CCPA and the Ohio Rail Development Commission ("ORDC") filed petitions to reject, revoke or stay the notice of exemption, claiming that RVI did not intend to operate the line and that it had previously made arrangements to scrap the line. In an order entered on January 9, 1997, the STB rejected RVI's notice of exemption because RVI had not acknowledged its common carrier obligations to provide service on the line and because CCPA had alleged that RVI would not operate, or arrange for another party to operate, the line. *See R.R. Ventures, Inc. – Acquisition and Operation Exemption – Youngstown and S. Ry. Co.,* STB Finance Docket No. 33336, 1997 WL 7537, at *1-2 (Service Date Jan. 9, 1997).

Subsequently, the Ohio & Pennsylvania Railroad Company ("OPRC"), ORDC, CCPA, the North East Ohio Trade & Economic Consortium, Mahoning County Commissioners, and other public agencies provided funding for the repairs to the line. However, when the Wintrow Construction Corporation ("Wintrow") attempted on January 31, 1997 to

---

[6]Under 49 U.S.C. § 10901, a party that is not a rail carrier may invoke the procedures for class exemption under 49 C.F.R. 1150.31 - 1150.34 to acquire an active rail line, rather than file a detailed application under 49 C.F.R. 1150.1 - 1150.10.

obtain, through a general release, RVI's permission to repair the rail line in order to restore rail service, RVI rejected Wintrow's general release form and refused to permit the necessary repairs to be made. As a result, the ORDC and CCPA filed a declaratory action on February 5, 1997 to prevent RVI from interfering with the repairs. On the same date, the STB's OCE sent a letter to RVI giving it 20 days to refile for the requisite authority to acquire the rail line and admonishing it not to interfere with OPRC's rail operations in the interim. *See R.R. Ventures*, 1997 WL 392877, at *2. In its response on February 25, 1997, RVI claimed that it had reached an agreement with the contractor hired to repair the flood-damaged track, and that repairs would begin on February 28, 1997 and would take about two months to complete. *Id*. RVI also indicated its intention to file for the legal acquisition of the rail line within 30 days of its letter. *Id*.

Given these assurances, the STB subsequently authorized RVI's retention of the line. A verified notice of exemption allowing RVI to acquire and operate the rail line was published on April 24, 1997. Notwithstanding the concerns of the ORDC and CCPA that "RVI has not demonstrated the remotest interest in undertaking the obligations and responsibilities involved in an acquisition of an active line for the purpose of conducting continuing rail freight common carrier obligations," the STB denied their petition for a declaratory order on July 15, 1997, as well as their petition to reject or revoke the notice of exemption. To allay the concerns of the ORDC and CCPA, however, the STB required RVI to "submit biweekly reports to the OCE on the status of the lines' restoration and to provide specific details of the cause of any delays in restoring service." *Id*. at *3.

Thereafter, RVI filed reports infrequently, and rail service was restored for only a short period of time in 1997. After repairs funded by state and local agencies were made to the line, another washout occurred. After this washout, RVI

*R.R. Ventures*, 2000 WL 1125904, at *5 (citing *Chicago and North Western Transp. Co. -- Abandonment*, 363 I.C.C. 956, 958 (1981) (Lake Geneva Line), *aff'd sub. nom. Chicago and North Western Transp. Co. v. United States*, 678 F.2d 665 (7th Cir. 1982)).

As previously stated, the regulations place the burden of proof on the offeror for all issues in dispute concerning the terms and conditions of the sale. 49 C.F.R. § 1152.27(h)(3). In its January 7, 2000 decision, the STB noted:

> Placing the burden of proof on the offeror is particularly appropriate in these proceedings because the offeror may withdraw its offer at any time prior to its acceptance of terms and conditions that we establish pursuant to a party's request. The rail carrier, on the other hand, is required to sell its line to the offeror at the price we set, even if the railroad views the price as too low.

*R.R. Ventures*, 2000 WL 1125904, at *5. The STB explained how this burden affected its method of valuing rail lines as follows:

> The burden of proof standard requires that, absent probative evidence supporting the offeror's estimates, the rail carrier's evidence is accepted. In areas of disagreement, the offeror must present more specific evidence or analysis or provide more reliable and verifiable documentation than that which is submitted by the carrier. Absent specific evidence supporting the offeror's estimates and contradicting the rail carrier's estimates, the fact that the burden of proof is on the offeror requires that we accept the carrier's estimates in these forced sales proceedings.

*Id.*

intervenor's argument regarding demand for an evidentiary hearing because another party "did not assert this specific claim before us") (citing *Ill. Bell Tel. v. FCC*, 911 F.2d 776, 786 (D.C. Cir. 1990)). Accordingly, we affirm the STB's October 4, 2000 decision to the extent that it ordered RVI to transfer its entire fee simple interest in the rail line as described in RVI's abandonment petition.

**3.    The STB's determination of the land value of the line was not unreasonable or arbitrary**

When setting the terms and conditions of a sale of a rail line, the STB cannot set a price lower than the "fair market value of the line." 49 U.S.C. § 10904(f)(1)(B). Pursuant to 49 U.S.C. § 10907(b)(1), the STB is directed to set the purchase price for the forced sale of a rail line at "not less than the constitutional minimum value." The "constitutional minimum value" is defined as "not less than the net liquidation value of such line or the going concern value of such line, whichever is greater." *GS Roofing II*, 262 F.3d at 774; *see also* 49 C.F.R. § 1152.27(h)(6) (defining "fair market value" as "constitutional minimum value which is the greater of the net liquidation value of the line or the going concern value of the line"). The STB must determine the sale price "on the basis of what the seller would have realized from the sale of the assets had the line in fact been abandoned." *Iowa Terminal*, 853 F.2d at 969. In the STB's January 7, 2000 decision setting the initial sale price, the STB explained its applicable valuation standard in OFA proceedings as follows:

> [I]n the absence of a higher going concern value for continued rail use, the proper valuation standard in proceedings for offers to purchase under section 10904 is the [net liquidation value] of the rail properties for their highest and best nonrail use. [Net liquidation value] includes the value of the real estate plus the [net salvage value] of the track and materials.

refused to fund any repairs and did not cooperate with the public agencies that sought to restore service, despite the repeated requests of local shippers and local and state government officials to resume rail service. *See R.R. Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County, PA,* STB Docket No. AB-556 (Sub-No. 1X), 1999 WL 23286, at *2 (Service Date Jan. 22, 1999). Specifically, Insul made a formal request on December 16, 1998, followed by Darlington Brick on January 4, 1999, for rail service to be restored to their facilities.

At this point, RVI filed a notice of class exemption on January 4, 1999 to abandon the rail line, claiming that "the line is not economically viable" and that "it should be allowed to abandon and either salvage it or permit other interested parties to acquire the line through the offer of financial assistance procedures under 49 U.S.C. § 10904 and 49 C.F.R. 1152.27." *Id.* at *2. On the same date, the OPRC also filed a notice of class exemption under 49 C.F.R. 1152.50 to discontinue service over the rail line. However, because RVI and OPRC improperly invoked the class exemption procedure, the STB, in a decision filed on January 22, 1999, denied both requests without prejudice to allow them to refile their respective petitions for abandonment and discontinuance.[7]

---

[7]As the STB explained:

> If the abandonment of the line is warranted by its economics, this could well be an acceptable approach for resolving the service issues surrounding RVI's acquisition of this line and could accommodate any interest in continued rail service over the line. The class exemption procedure, however, does not provide the information that the Board needs to make this determination because it does not provide for a projection of the financial results of future operation of the line. This information

On May 19, 1999, RVI submitted another application to the STB for exemption from certain regulations pursuant to 49 U.S.C. § 10502, and for authority to abandon the rail line pursuant to 49 U.S.C. § 10903(a). In its petition, RVI stated that the line had been out of service for two years due to the washout and an embargo. RVI's petition also included a verified statement of David Handel, RVI's president, who stated that RVI's right-of-way extended from mile post 0.0 to milepost 35.7, consisting of 302.016 acres, and that its net liquidation value of $1.6 million was based upon a full fee interest in the property.

CCPA then relied upon Handel's description of the property and his valuation of the full fee interest in the rail line when it prepared its estimate of the purchase price during the OFA process. On August 3, 1999, CCPA, invoking the OFA procedures set forth in 49 U.S.C. § 10904 and 49 C.F.R. 1152.27(a), requested financial data and information from RVI concerning an estimate of the minimum purchase price required to keep the line in operation, the estimated net liquidation value of the line and documentation showing that RVI had marketable title to the land. Although RVI provided some of the information on August 10, 1999, it advised CCPA to arrange for copying the valuation maps and deeds for the line at RVI's offices. However, when CCPA arranged for its retained appraiser, Mr. John Rossi of Real Estate Appraisal Associates, to visit RVI's business office, he was

---

is required for the Board to make an informed decision on whether to approve the abandonment of this line of railroad and for other parties who might be interested in purchasing the line under section 10904 to restore service.

*R.R. Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County, PA,* STB Docket No. AB-556 (Sub-No. 1X), 1999 WL 23286, at *2 (Service Date Jan. 22, 1999).

*County of Allegheny*, 74 Pa. Cmwlth. 85, 90, 459 A.2d 1298, 1300 (1983) ("Black's Law Dictionary defines a fee simple estate as 'one in which the owner is entitled to the entire property, with unconditional power of disposition during his life, and descending to his heirs and legal representatives upon his death intestate.'").

Moreover, contrary to RVI's contention, there was no unconstitutional taking in this case. *See* U.S. Const. amend V ("[N]or shall private property be taken for public use, without just compensation."); *In re Chicago, Milwaukee, St. Paul and Pacific Ry. Co.*, 799 F.2d 317, 324 (7th Cir. 1986). As set forth in 49 U.S.C. § 10907(b)(1), Congress authorized the STB to force the sale of a railroad line at its "constitutional minimum value" to "a financially responsible person." *GS Roofing II*, 262 F.3d at 771. That is what occurred here. *See United States v. 50 Acres of Land*, 469 U.S. 24, 25, n.1 (1984) (noting that the constitutional measure of just compensation is "what a willing buyer would pay in cash to a willing seller")(quoting *United States v. Miller*, 317 U.S. 369, 374 (1943)).

Finally, although it appears that the STB approved certain transactions by RVI with third parties after RVI filed its abandonment petition, we note that these transactions are not being challenged on appeal. Specifically, CCPA, as an intervening party in these proceedings pursuant to Rule 15(d) of the Federal Rules of Appellate Procedure, has not appealed from the STB's orders and has requested affirmance of its decisions. Because CCPA has not challenged the STB's approval of RVI's conveyance of certain property interests associated with the rail line after RVI filed its abandonment petition, it is therefore unnecessary to remand for further proceedings since CCPA is not seeking to acquire those property interests not conveyed to it. *See Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC*, 962 F.2d 27, 37 n.4 (D.C.Cir.1992) (refusing to reach

Notwithstanding, RVI argues that it should not be required to convey a fee simple interest in the rail line because the STB in its January 7, 2000 decision only required it to transfer "all property by quit claim deed." As RVI notes, a "quit-claim deed transfers only those rights which a grantor has at the time of the conveyance." *Finomore v. Epstein*, 18 Ohio App.3d 88, 89, 481 N.E.2d 1193, 1196 (Ohio App. 1984) (citing *Jonke v. Rubin*, 170 Ohio St. 41, 41, 162 N.E.2d 116, 116 (1959)); *Greek Catholic Congregation of Borough of Olyphant v. Plummer*, 338 Pa. 373, 377, 12 A.2d 435, 437 (Pa. 1940). At the time of the conveyance in these cases, RVI was required to transfer a full fee interest in the property. Thus, the STB's order directing RVI to transfer "all property by quit-claim deed" was tantamount to ordering it to transfer a fee simple interest in the property associated with the rail line.

In addition, because CCPA acquired a fee simple interest in the rail line, RVI was required to transfer all its property interests associated with the rail line. Under Ohio law, a fee simple is the highest right, title and interest that one can have in land; it is the full and absolute estate in all that can be granted. *Masheter v. Diver*, 20 Ohio St.2d 74, 78, 253 N.E.2d 780, 782 (1969); *see also* 20 Ohio Jurisprudence 2d 237, Estates, Section 8 ("An estate in fee simple is the entire interest and property in the land."); *Muirfield Ass'n, Inc. v. Franklin County Bd. of Revision*, 73 Ohio St.3d 710, 711, 654 N.E.2d 110, 111 (1995) (defining "fee simple" as "[a]bsolute ownership unencumbered by any other interest or estate; subject only to the limitations of eminent domain, escheat, police power, and taxation") (quoting the *American Institute of Real Estate Appraiser's Dictionary of Real Estate Appraisal* (1984)). Equally, under Pennsylvania law, "[a] fee simple absolute is a form of ownership in which a party has unlimited power to sell, transfer, alienate, or bequeath the property in any lawful manner." *In re Estate of Rider*, 711 A.2d 1018, 1021 (Pa. Super. 1998); *see also Captline v.*

denied access by RVI to the relevant valuation maps and deeds.

On September 2, 1999, the STB granted RVI's petition for exemption pursuant to 49 U.S.C. § 10502, stating that any party interested in purchasing the line for continued rail service could submit an offer of financial assistance ("OFA"), pursuant to 49 U.S.C. § 10904 and 49 C.F.R. § 1152.27(c)(1), by September 13, 1999. *See R.R. Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County, PA,* STB Docket No. AB-556 (Sub-No. 2X), 1999 WL 714565 (Service Date Sept. 3, 1999). In the absence of an OFA, the exemption became effective October 3, 1999, allowing RVI to salvage track, ties, and other railroad appurtenances, and to dispose of the right-of-way.

On September 3, 1999, one day after the STB granted RVI's exemption petition, CCPA formally notified RVI and the STB that it was considering an OFA to purchase the line for rail service. CCPA also petitioned the STB to toll the period for submitting an OFA until 30 days after RVI had supplied all requested documents and information.[8]

---

[8] Subsequently, CCPA also sought to acquire a railroad line between Struthers and Youngstown, Ohio from the bankruptcy estate of Pittsburgh & Lake Erie Properties, Inc. to allow Central Columbiana & Pennsylvania Railway, Inc. ("CCPR") "to operate from Darlington to the point of interchange with CSX Transportation, Inc., at milepost -3.0 at or near Struthers, and with Norfolk Southern Railway Company at milepost -1.5 at Haselton Yard." *Columbiana County Port Auth. – Acquisition Exemption – Certain Rail Assets of Pittsburgh & Lake Erie Props., Inc., in Mahoning County, OH,* STB Finance Docket No. 33880, 2000 WL 821476, at *1 (Service Date June 26, 2000). We note that Youngstown & Southern Railroad Company, which owned the rail line at issue in the present cases before its purchase by RVI, was a wholly owned subsidiary of the Montour Railroad Company, which, in turn, was a wholly owned subsidiary of Pittsburgh & Lake Erie Properties, Inc.

18   *Railroad Ventures, et al.*    Nos. 00-3261/3275/3317/
     *v. Surface Transp. Bd.,*    4303/4345/4346/4435;
     *et al.*    01-3090/3091

Specifically, CCPA requested that RVI provide information about its estimated minimum purchase price to continue rail operations; its estimated net liquidation value of the line, including real estate appraisals; its property interest in the line; and valuation maps for the line. On September 10, 1999, the STB granted CCPA's requested extension of time, allowing CCPA to file an OFA within thirty days of RVI's provision of the requested information, ordering RVI "promptly to provide offerors with all of the information required by 49 C.F.R. 1152.27(a)." *See R.R. Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County, PA,* STB Docket No. AB-556 (Sub-No. 2X), 1999 WL 715271, at *2 (Service Date Sept. 10, 1999). The STB also extended the effective date of RVI's exemption until forty days after RVI had provided the information. *Id.* at *3.

Shortly thereafter, by a letter dated September 20, 1999, CCPA's attorney advised the STB and RVI that CCPA expected to acquire a full fee interest held by RVI as well as "all of the interests encompassed in RVI's estimate of purchase price to keep the line in operation." (J.A. at 545.) RVI's counsel responded the following day, stating that "should CCPA determine that it is necessary to acquire a fee interest in the right of way in order to operate the rail line under 49 C.F.R. § 1152.27, RVI will convey such an interest." (J.A. at 546.)

In a letter filed on October 12, 1999, CCPA informed the STB that RVI had provided sufficient information for CCPA to continue with its OFA and that it would file an OFA on or before November 8, 1999, thirty days after receipt of the information from RVI. *See R.R. Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County, PA,* STB Docket No. AB-556 (Sub-No. 2X), 1999 WL 1030076, at *1 (Service Date Nov. 12, 1999).

Nos. 00-3261/3275/3317/    *Railroad Ventures, et al.*   51
4303/4345/4346/4435;      *v. Surface Transp. Bd.,*
01-3090/3091      *et al.*

over the matter, any transactions affecting the property interests associated with the rail line entered into by a rail owner after filing an abandonment petition are invalid.

Although the STB erred in its interpretation of § 10904(f)(1)(B), we nonetheless affirm the STB's October 4, 2000 decision to the extent that it ordered RVI to transfer its entire fee simple interest in the property constituting the line that was the subject of RVI's exemption petition for abandonment. In this case, RVI, in its abandonment petition dated May 19, 1999, submitted the verified statement of its president, David Handel, stating that RVI sought to abandon the rail line comprising 302.016 acres from milepost 0.0 to milepost 35.7, including "a short spur line and several buildings referred to generically as the Negley Shops." RVI placed the fair market value of the full fee interest "for the 302.016 acres of ground comprising the RVI right of way" at $1,162,555. When CCPA thereafter inquired about the property to be sold, RVI confirmed that "an ample description of the line in question and the acreage involved in this rail line" was provided in its abandonment petition. (J.A. at 860, 1681.) RVI also advised both the STB and CCPA in a letter dated September 21, 1999 that "[s]hould CCPA determine that it is necessary to acquire a fee interest in the right of way in order to operate the rail line under 49 C.F.R. § 1152.27, RVI will convey such an interest . . . pursuant to the requirements of the STB's OFA regulations." (J.A. at 546.) Based upon RVI's representations in its abandonment petition, it was then CCPA's prerogative, as a prospective OFA purchaser, to determine how much of the rail line it wished to acquire. In this case, CCPA sought to acquire a fee simple interest in the entire rail line as described in RVI's abandonment petition. Therefore, CCPA was entitled to acquire the entire fee simple interest in the property comprising the rail line that was the subject of RVI's abandonment petition.

these reasons, we conclude that the STB's interpretation is unreasonable.

Under § 10904(f)(1)(B), the STB's task is not to determine the extent of the property associated with the rail line that is being transferred, but to set the terms of the sale in the event that the parties cannot come to an agreement about these terms. As explained, the determination about what property is being conveyed in the sale of a rail line is made by the parties to the transaction. Pursuant to the abandonment and OFA provisions of the ICCTA, the abandoning rail line owner identifies the property that is being abandoned in its abandonment petition, while the prospective OFA purchaser submits an offer to buy the rail line being abandoned, either in whole or part. None of this requires the STB to determine how much of the rail line is being acquired; the parties do that. However, if the parties cannot come to an agreement about the terms of the sale, the STB has the authority under § 10904(f)(1)(B) to set the terms and force the sale of a railroad line at its constitutional minimum value.

Reading the ICCTA as a whole, we hold that once a rail line owner files a petition seeking authority to abandon a rail line, a qualified OFA purchaser is entitled to determine whether to purchase the rail line, as described in the abandonment petition, in whole or part. Therefore, a rail owner seeking authority to abandon a rail line is not permitted to reduce or diminish the property associated with the rail line, as identified in the abandonment petition, until the OFA process is concluded. Once a qualified OFA buyer has offered to purchase the rail line, as described in the abandonment petition, postponement of the abandonment petition remains in effect until the line owner and prospective OFA buyer have come to an agreement on the terms of the sale or until the STB sets the terms of the sale upon the request of either party. 49 U.S.C. § 10904(d)(2)-(f). As a consequence, until such time that the STB loses jurisdiction

On November 8, 1999, CCPA filed a timely OFA to purchase the line for $419,360. This offer consisted of $350,000 for the land and $69,360 for the track and materials. CCPA compared its offer with RVI's stated net liquidation value of $1,607,555 ($1,162,555 for the real estate and $445,000 for track salvage), offering explanations for the disparity in the values, as required by 49 C.F.R. § 1152.27(c)(ii)(C ). *Id*. In particular, CCPA's estimate of a total track value of $69,360 was based upon the cost of disposing of approximately 125,214 bad cross ties, roughly 99% of the cross ties on the line. Using RVI's own estimate of tie disposal costs, CCPA reduced RVI's estimate by $375,642. *Id*. at *2.

In a decision on November 12, 1999, the STB found CCPA to be "financially responsible" pursuant to 49 U.S.C. § 10904(d)(1). *Id.* The STB therefore postponed, pursuant to 49 U.S.C. § 10904(d)(2), the effective date of the exemption authorizing RVI's abandonment of the line during the pendency of the OFA process. *Id.* The STB informed RVI and CCPA that if they were unable to agree on a purchase price for the line, then either party could request the STB, on or before December 8, 1999, to set the terms and conditions of the sale pursuant to 49 U.S.C. § 10904(e). *Id.*

By December 8, 1999, CCPA and RVI were unable to agree on the amount to be paid for the rail line. Thus, exercising its statutory right under § 10904(f)(1), CCPA filed its request on December 8, 1999 for the Board to establish the terms of the sale. CCPA requested a purchase price of $441,700, consisting of $350,000 for the land and $91,705.67 for track materials. *See R.R. Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County, PA,* STB Docket No. AB-556 (Sub-No. 2X), 2000 WL 1125904, at *1 (Service Date Jan. 7, 2000). CCPA also requested that the STB clarify the property interests CCPA would receive in acquiring the line. CCPA specifically asked

the STB to require RVI to "convey to CCPA a full fee title interest in the land comprising the right-of-way, except in any instance where, prior to the institution of this OFA proceeding, RVI did not possess such an interest in the right-of-way." In addition, CCPA advised the STB that it had recently discovered that RVI, after being advised of CCPA's OFA submission, had entered into a series of transactions to reduce the size and value of the property. Specifically, CCPA sought invalidation of the November 5, 1999 Grade Separated Crossing Settlement Agreement ("GSCSA") that RVI had entered into with Boardman Township, purportedly extending to RVI's successors in interest, requiring the construction of an overpass or underpass at a crossing between the railway and a highway as a precondition to restoration of rail service. *Id.* at * 2. CCPA also challenged other transactions entered into by RVI without the STB's authorization in violation of the OFA procedures that reduced the value of the right-of-way, including: (1) the sale of utility crossing easements to First Energy Corporation (Ohio Edison Company) for $893,000, allowing for permanent aerial easements along and across the property; (2) the assignment to Venture Properties of Boardman, Inc. ("VPB") of all right, title, and interest to income, proceeds, accounts receivable, royalties, and other payments arising from third-party agreements which are attributable to the line; (3) the sale of a 4.012-acre segment to Boardman Township Park District for $140,000; and (4) a contingent agreement for the sale of approximately 20.6 acres of the right-of-way for a 4.2 mile bicycle trail. *Id.* at * 4.[9]

_____

[9]While CCPA's appraiser considered the sale of the utility crossing easements to First Energy Corporation and the assignment of RVI's interests to its affiliate VPB in adjusting the land value of the right of way, the appraiser did not consider the transactions between RVI and Boardman Township Park District because they were entered into the day before CCPA submitted its OFA to the STB and RVI.

possibility of interference with future rail service as a result of conflicts between the purchaser of the rail line and parties perhaps holding subsurface, aerial or easement rights acquired after the abandoning rail carrier filed its petition seeking the STB's authority to abandon the line.

Interpreting § 10904(f)(1)(B) as part of a symmetrical and coherent regulatory scheme, we therefore conclude that the STB erred in construing the statutory provision as implying a "rebuttable presumption" under which an OFA purchaser is entitled to purchase all the property interests associated with a rail line subject to an abandonment petition unless the abandoning rail line owner shows that effective rail service can be provided with less than the entire rail line. There are several problems with the STB's interpretation. First, there is no apparent textual support in the statutory provisions or the regulations governing the abandonment and OFA process for implying a "rebuttable presumption." But more important, by reading a rebuttable presumption into the statute, the STB shifts the burden of proof to the abandoning rail line owner, which is contrary to its own regulation that states that "the offeror has the burden of proof as to all issues in dispute." 49 C.F.R. 1152.27(h)(3). As a practical matter, this may lead to intractable problems in consummating the sale of rail lines, as the present cases exemplify, defeating the purpose of having an expedited abandonment process. Specifically, the STB's construal of the statute as implying a rebuttable presumption creates the prospect of protracted abandonment proceedings as the parties argue about what property associated with the rail line is or is not necessary for effective rail service. The STB's interpretation is also problematic because it raises questions about applying the statute in a way that is not arbitrary or capricious. As argued by RVI in these cases, the STB's decision regarding what property is necessary for effective rail service appears arbitrary because it does not seem to be based upon objective principles or criteria. For

from a practical perspective since a prospective OFA buyer has to act quickly, examining and evaluating pertinent data about the condition of the line, its traffic and revenue before submitting an OFA, which is due within ten days of the decision of the STB granting a petition for abandonment or exemption.    49 U.S.C. § 10904(c); 49 C.F.R. § 1152.27(c)(1)(i)(B).    Thus, to ensure the efficacious valuation of a rail line, it is essential that the property interests associated with the rail line remain stable.

Maintenance of the status quo upon the filing of an abandonment petition also promotes the practical goal of properly administering the statute since the STB is obligated to make certain decisions within a highly constrained time frame so as to advance the goal of continuous rail service. Specifically, it accords with the purpose of the forced-sale provision set forth in 49 U.S.C. § 10904, which is to promote the continuation of viable rail service, not simply the maintenance of the rail line itself. *See Hayfield*, 467 U.S. at 630 (noting that the present § 10904 "represents a continuation of Congress' efforts to accommodate the conflicting interests of railroads that desire to unburden themselves quickly of unprofitable lines and shippers that are dependent upon continued rail service"); *Consol. Rail Corp*, 29 F.3d at 712.    Accordingly, the objective of continuing viable rail service in behalf of interstate commerce in this country, as well as commerce throughout the continent, is better achieved by not permitting the transfer of property interests associated with the rail line after the filing of the abandonment petition.[14]    It also protects the integrity of the OFA process by ensuring transparency.    Ultimately, it produces finality and certainty in the OFA process, leading to the expeditious acquisition of a rail line and eliminating the

---

[14]Through the Commerce Clause, Congress has the power to "regulate Commerce with foreign Nations, and among the several States. . . ." U.S. Const. art. I §, cl. 3.

RVI replied to CCPA's request to set the terms of the sale on December 10, 1999, contending that the STB should order it to convey no more than the minimum property interest necessary for the provision of rail operations, which it defined as the track, related track appurtenances and a surface easement for rail purposes.    RVI suggested that a sufficient interest would consist of surface rights enabling the purchaser to use the line for rail purposes, "conveyed by means of an easement, right of way agreement or quit claim deed subject to various reservations or reversionary interests." RVI further asked the STB not to set aside its third-party transactions pertaining to the line, contending that it was not obligated to inform CCPA of those transactions, since they would not affect CCPA's use of the right-of-way for rail services. Despite the fact that RVI had valued the entire line at $1.6 million in its abandonment petition, RVI also challenged CCPA's requested purchase price, claiming that the limited property interest in the rail line that it was prepared to sell to CCPA was now worth $2,261,490, almost three times as much as RVI paid for the rail line when it purchased it on November 8, 1996.    Specifically, RVI disputed CCPA's valuation method, offering its valuation of the surface rights in the line as an assembled corridor to be worth $1,472,930 and valuing the track materials at $788,560.

1. **The STB's January 7, 2000 decision setting the terms and conditions of the sale**

The STB issued its decision setting the terms and conditions for the sale of the rail line on January 7, 2000. Explaining that the offeror in a forced sale bore the burden of proof, the STB stated that it would accept the seller's (RVI) price estimates unless the offeror (CCPA) "present[s] more specific evidence or analysis or provide[s] more reliable and verifiable documentation." *Id*. at *5.    Adhering to this framework, the STB accepted RVI's track value of $788,560, but subtracted $58,000 for work to restore grade crossings, to

reach a net salvage value for track and materials of $730,560. *Id.* at *6. The STB rejected, however, RVI's valuation of the land as an assembled corridor. The STB explained:

> Unless there is a specific documented interest expressed by a potential purchaser of an intact corridor, we do not consider this to be an acceptable method of valuation for [net liquidation value] purposes. The highest and best non-rail use is to sell parcels to adjoining landowners or other interested parties. *See Boston and Maine Corp. – Abandonment – In Hartford and New Haven Counties, CT*, STB Docket No. AB-32 (Sub-No. 83), *et al.*, slip op. at 4 (STB served July 1, 1998) [1998 WL 348755, at *3].

*Id.* at *6. The STB summarized RVI's evidence for valuing the land as an assembled corridor as amounting to two appraisals and copies of purchase agreements for trail and utility easements, as well as expressions of interest to buy some sections of the line, "but no firm offers to purchase the entire right-of-way, much less an executed sales contract." *Id.* Absent an executed sales contract or firm purchase offer for an assembled corridor, the STB concluded that RVI could not demonstrate that an assembled corridor was the "highest and best use" of the line.[10] *Id.*

In contrast, the STB accepted CCPA's "across-the fence" ("ATF") valuation methodology, finding it "complete and

---

[10]The STB noted that its predecessor, the ICC, had decided in *Portland Traction Co. – Abandonment Exemption – In Multnomah & Clackmas Counties, OR*, Docket No. AB-225 (Sub-No. 2X), 1990 WL 287141, at *4 (Service Date Jan. 10, 1990), that an executed sales contract would constitute the best evidence of a right-of-way's marketability and net liquidation value as an assembled corridor.

sale, however, the STB cannot place any burden on the offeree (i.e., the abandoning rail owner). *See* 49 C.F.R. §1152.27(h)(3) ("The offeror has the burden of proof as to all issues in dispute.")

In short, once the owner of a rail line submits a petition seeking the STB's authority to abandon the line, it must allow a prospective OFA purchaser the opportunity to determine how much of the line to acquire, as the line is described in the abandonment petition. Thus, at the point of filing the abandonment petition, the abandoning rail line owner cannot reduce or diminish the rail line or the nature of the property interests associated with the line. Because a rail line owner is subject to the STB's jurisdiction until such time that the line has been properly abandoned or sold, it therefore must maintain the status quo with respect to its property interests in the rail line as described in its abandonment petition.

The primary reason for maintaining the status quo with respect to the property interests associated with the rail line as described in the abandonment petition is to allow a prospective OFA buyer sufficient opportunity to assess whether the acquisition of the line is economically viable and to determine what valuation to place on the rail line that it seeks to acquire. In this respect, it is evident that a rail line embraces more than just the track necessary for the provision of rail service. *See Iowa Terminal,* 853 F.2d at 965 (rejecting the abandoning railroad's attempt to limit the transfer of land to two, rather than ten, acres, even though eight acres of land had been leased for nonrail purposes for several years, since "[t]he purpose of the statute empowering the [STB] to mandate a sale is to keep viable lines in operation"); s*ee also In re Boston & Maine Corp.*, 596 F.2d 2, 6 (1st Cir. 1979) (noting that a "'railroad line' is not merely the service being provided, but the physical properties and interests belonging to the debtor that constitute the line"). Holding the status quo from the filing of the abandonment petition is imperative

which a prospective OFA buyer may offer to buy the line that is the subject of an abandonment application").  Further expediting the abandonment proceedings is the regulation shortening the time for filing an OFA to ten days.  *See* 49 C.F.R. 1152.27(b).  When an OFA is made by a financially responsible party "regarding that part of the railroad line to be abandoned," 49 U.S.C. § 10904(d)(1), the abandonment of the line is then postponed until the terms and conditions of the sale are established.  49 U.S.C. § 10904(d)(2).

Thus, while a railroad may "abandon any part of its railroad lines" under 49 U.S.C. § 10903(a)(1)(A), the STB is permitted to authorize a prospective buyer under the OFA provisions to purchase "that part of the railroad line to be abandoned" under 49 U.S.C. § 10904(d).  The line owner can seek authority to abandon all or a part of its rail line, but if it does so, then, pursuant to § 10904(f)(1)(B), a qualified OFA purchaser is entitled to determine how much of the line it wishes to acquire.[13]  Once the offeror seeks to purchase the entire rail line or a portion thereof as described in the abandonment petition, 49 U.S.C. § 10904(c), the STB is then statutorily obligated to render a decision setting price and other sale terms as to what the offeror seeks to buy, within thirty days of a request to set conditions.  49 U.S.C. § 10904(f)(1)(A).  Under this statutory provision, then, it necessarily follows that neither the abandoning rail carrier nor the STB can alter or amend what the OFA buyer has offered to buy; rather, the STB can only set the terms on what the offeror has proposed to purchase.  In setting the terms of the

---

[13]On the other hand, if the line owner retains any part of the land, then its common carrier duty over that part of the line remains in effect, in the absence of an embargo, and the line owner may not abandon a retained portion absent STB approval. *See GS Roofing I*, 143 F.3d at 391-92. To the extent, then, that RVI did not include non-contiguous portions of the line in its abandonment application, CCPA could not acquire those properties through its OFA. However, RVI cannot sell those tracts unless it obtains the permission of the STB.

adequately supported."[11] *Id*. at *6. The STB also accepted CCPA's reduction in the value of the land by $100,000 due to RVI's assignment of lease and interest income to a third party.  Accordingly, the STB valued the land for the entire line at $350,000, added in $730,560 for track and materials, and set a purchase price of $1,080,560.

In addition to setting these terms and conditions for the purchase of the line, the STB also addressed RVI's third-party transactions.  Concerning the Grade Separated Crossing Settlement Agreement ("GSCSA") between RVI and Boardman Township, the STB acknowledged that while it favored privately negotiated agreements in general, it would deem void as against public policy any agreement imposing restrictions unreasonably interfering with common carrier obligations, citing *United States v. Baltimore & Ohio R.R. Co.*, 333 U.S. 169, 177-78 (1948) for the proposition "that parties may not enter into trackage rights agreements that abrogate rights and responsibilities under the statutory provisions of the Interstate Commerce Act." *Id*. at *2. CCPA opposed the GSCSA on the grounds that it created a condition precedent to reestablishment of rail service and obliged CCPA (or RVI's successor in interest) to undertake extremely costly construction projects to build the projected overpass or underpass.  According to CCPA, enforcement of the GSCSA would cause it to forego its acquisition of the rail line, since CCPA estimated that the cost of one overpass or underpass would likely exceed the net liquidation value of the entire rail line.  As a result, the STB found that the terms of the GSCSA

---

[11]"Across-the-fence" or "over-the-fence" valuation method is among various methods used in appraising railroad property.  The "across-the-fence" method, which compares the railroad property with "adjacent or nearby industrial and commercial property," is so-called "because it bases the best use and value of the railroad property on the use and value of the land across the fence from the railroad land." *Chesapeake W. Ry. v. Forst*, 938 F.2d 528, 529 (4th Cir. 1991).

imposing obligations on parties other than RVI and Boardman Township and requiring construction of the grade separated crossing as a precondition to resuming rail operations unreasonably interfered with common carrier operations and the OFA process. *Id.* Because the STB also found these terms to "circumvent [its] statutory authority to set the terms and conditions of the sale under 49 U.S.C. [§] 10904(f)(1)," it thus concluded that these terms were unenforceable as contrary to public policy. *Id.*

Although the STB voided the GSCSA, it decided not to set aside the other transactions between RVI and other third parties, which CCPA had challenged on the grounds that they diminished the value of the line. As for the sale of utility crossing easements to First Energy Corporation (Ohio Edison Company), the transfer of all rights to Venture Properties of Boardman, Inc. ("VPB") arising from third-party agreements attributable to the line, the sale of a 4.012-acre segment to the Park District, and the contingent sale of about 20.6 acres of the right-of-way for a 4.2 mile bicycle trail, the STB concluded that they did not interfere with rail operations, but would be factored into its calculation of the line's value. *Id.* at * 4-5. In particular, the STB noted that the sale of 4.012 acres to the Park District was explicitly conditioned on the continuation of rail service on the line.

The STB instructed CCPA to accept or reject the terms in writing within ten days, ordered RVI and CCPA to close on the deal within ninety days, and required RVI to convey "all property by quitclaim deed." The STB further stated that if CCPA withdrew from the sale or failed to accept by timely written notification, then it would issue, within twenty days, a decision authorizing abandonment. RVI, Boardman Township, and the Boardman Township Park District have filed petitions with this Court for review of the STB's January 7, 2000 decision.

*Kulmer*, 236 F.3d at 1257.

Reading the statutory and regulatory scheme as a whole, we discern a clear symmetry between the abandonment and OFA provisions of the ICCTA. While a line owner may "abandon any part of its railroad lines," it cannot do so without the STB's approval. 49 U.S.C. § 10903(a)(1)(A); *GS Roofing I*, 143 F.3d at 391. Significantly, when the owner of a rail line seeks to abandon a line, it must "identify each railroad line for which the rail carrier plans to file an application to abandon." 49 U.S.C. § 10903(c)(2)(B). Under 49 C.F.R. § 1152.22, an owner seeking to abandon a rail line must set forth the following information in its abandonment application:

> [a d]etailed map of the subject line on a sheet not larger than 8x10 ½ inches, drawn to scale, and with the scale shown thereon. The map must show, in clear relief, the exact location of the rail line to be abandoned or over which service is to be discontinued and its relation to other rail lines in the area, highways, water routes, and population centers.

49 C.F.R. § 1152.22(a)(4). The ICCTA also directs that a rail carrier seeking authorization to abandon a rail line under 49 U.S.C. § 10903 must promptly provide a party considering an OFA with a report on the physical condition of "that part of the railroad line involved in the proposed abandonment," as well as other information required to determine the amount of financial assistance needed "to continue rail transportation over that part of the railroad line" and an estimate of the minimum purchase price required "to keep the line or a portion of the line in operation." 49 U.S.C. § 10904(b). An OFA purchaser then has four months after the abandonment petition has been filed to "offer to subsidize or purchase the railroad line that is the subject of such application." 49 U.S.C. § 10904(c); s*ee Kulmer*, 236 F.3d at 1256 (noting that "[t]he OFA provisions create a four-month waiting period" during

44     *Railroad Ventures, et al.*     Nos. 00-3261/3275/3317/
       *v. Surface Transp. Bd.,*          4303/4345/4346/4435;
       *et al.*                       01-3090/3091

(holding that city could condemn a tract of land for public use, such as for a street, but could not take property to sell it at a profit and pay for the improvement), *aff'd*, 281 U.S. 439 (1930).

The STB disagrees with RVI's construction of 49 U.S.C. § 10904(f)(1)(B), arguing that the language on which RVI focuses – "all facilities on the line or portion necessary to provide effective transportation services" – does not pertain to how much of the rail line a line owner can choose to transfer, but instead concerns the extent of the line an OFA purchaser may choose to buy. If the purchaser views less than the entire amount of property as sufficient for rail operations, then the purchaser may offer to purchase only that amount. *See, e.g.*, *Iowa Terminal*, 853 F.2d at 968 (describing purchaser's offer for a 10.4-mile segment of a 26.1-mile line). If, however, an offeror, such as CCPA, wishes to obtain all the property described in the abandonment petition, the STB argues that it is reasonable to presume that the entire amount is necessary for effective rail services.

Although the STB's construction of § 10904 is entitled to deference, courts ultimately have the responsibility for interpreting federal statutes. *Crounse Corp.*, 781 F.2d at 1183. As pointed out by the Tenth Circuit in *Kulmer*:

"In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 130-132, 120 S. Ct. 1291, 1300, 146 L. Ed.2d 121 (2000). Rather, a court must read the relevant provisions in context and, insofar as possible, "interpret the statute 'as a symmetrical and coherent regulatory scheme.'" *Id.*, 529 U.S. at 132-134, 120 S. Ct. at 1301 (quoting *Gustafson v. Alloyd. Co.*, 513 U.S. 561, 569, 115 S. Ct. 1061, 131 L.Ed.2d 1 (1995)).

Nos. 00-3261/3275/3317/     *Railroad Ventures, et al.*    25
4303/4345/4346/4435;         *v. Surface Transp. Bd.,*
01-3090/3091                         *et al.*

### 2. The STB's March 3, 2000 decision that CCPA accepted the terms and conditions of the sale

Following the STB's January 7, 2000 decision, CCPA sent a letter dated January 12, 2000, which was received by the STB on January 14, 2000, stating that it "hereby accepts the terms and conditions established by the Board in its decision served on January 7, 2000 for acquisition of Railroad Ventures' 35.7 mile line of railroad extending from milepost 0.0 at Youngstown, OH to milepost 35.7 at Darlington, PA, and a connecting one mile line segment near Negley, OH." CCPA added:

[CCPA] does so on the understanding, (1) that it will be receiving a fee simple estate in the subject property free and clear of any reservations, liens, encumbrances, licenses, leases, easements or restrictions except those which were in existence prior to November 8, 1999, and considered by Mr. Rossi in the appraisal which was adopted by the Board, and (2), that taxes on the subject property will be apportioned as between the parties as of the date of settlement.

(J.A. at 1211.) CCPA also sent the same letter to RVI on January 12, 2000. After receiving this letter, RVI wrote to the STB on January 18, 2000, objecting that CCPA's letter did not constitute a valid acceptance of the STB's sale terms. On January 20, 2000, RVI followed this letter with a petition to the STB to vacate the decisions postponing the effective date of the abandonment authority. RVI contended that by accepting the STB's terms "on the understanding" that it would receive an unencumbered fee simple estate, CCPA sought to alter in a material way the terms set by the STB, which had ordered conveyance pursuant to a quitclaim deed, without requiring RVI to make any warranty regarding the title it possessed. RVI also argued that CCPA's acceptance was "conditional," not "absolute." Relying upon principles of

contract law, RVI urged the STB to view CCPA's letter as a rejection of the terms set forth in the decision of January 7, 2000 and to treat the letter as the submission of a counteroffer by CCPA.

On March 3, 2000, the STB issued a decision rejecting RVI's arguments regarding CCPA's acceptance of the terms set forth in the January 7, 2000 decision. *See R.R. Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County, PA,* STB Docket No. AB-556 (Sub-No. 2X), 2000 WL 246367 (Service Date Mar. 3, 2000). The STB viewed CCPA's letter dated January 12, 2000 as "a valid acceptance" of the sale terms, noting that CCPA followed RVI's initial objection with another letter "unequivocally" reiterating its acceptance. The STB described CCPA's second letter as follows:

> By letter filed on January 19, 2000, CCPA states that it has accepted the terms and conditions of the January 7 decision and explains that, given the history of its dealings with RVI, the additional language in its acceptance letter indicating its understanding of the transaction was prudent and necessary.

*Id.* at *2. The STB then ordered RVI to convey by quitclaim deed "all of its property interests, as discussed in this decision, in its 35.7-mile line of railroad extending from milepost 0.0 at Youngstown, OH, to milepost 35.7 at Darlington, PA, and a connecting 1-mile line segment near Negley, OH" provided that CCPA tendered payment on or before April 6, 2000. *Id.* at *4. The STB also admonished RVI that it should not "unilaterally diminish the assets or their

49 U.S.C. § 10904(f)(1)(B). In its October 4, 2000 decision, the STB interpreted the parenthetical language as follows:

> it serves merely to clarify that an offeror need not purchase the entire property slated for abandonment, but can opt to acquire less than the full length of the line where the offeror wishes to provide for continued rail service on only a portion of the line.

*R.R. Ventures*, 2000 WL 1470451, at *6. In rejecting RVI's proposed interpretation of § 10904(f)(1)(B), the STB articulated a presumption, rebuttable by the line owner, that an OFA purchaser would need all the property interests associated with the rail line in order to provide effective transportation operations. Applying this rebuttable presumption, the STB decided that RVI had failed to show that CCPA could provide effective rail services on less than the entire rail line.

In opposition to the STB's interpretation, RVI construes 49 U.S.C. § 10904(f)(1)(B) as Congressional recognition that an owner need not transfer all property comprising the line, and as a rejection of the STB's plenary power to force conveyance of all property interests, particularly those unrelated to rail operations. RVI explains that Congress recognized that some of the property included in a rail line abandonment petition might be necessary for rail operations, but some would not. Further, according to RVI, the Fifth Amendment limits the STB's authority to force the sale of property for public purposes. *See Chicago & N.W. Transp. Co. v. United States*, 678 F.2d 665, 668 (7th Cir. 1982) (suggesting that the price set under the OFA proceeding must satisfy "just compensation" principles of the Fifth Amendment). RVI argues that government agencies, such as the STB, can only require a transfer of the quantity of property or degree of interest necessary to accomplish the public purpose. *Cf. City of Cincinnati v. Vester*, 33 F.2d 242, 245 (6th Cir. 1929)

42   *Railroad Ventures, et al.*     Nos. 00-3261/3275/3317/
     *v. Surface Transp. Bd.,*       4303/4345/4346/4435;
     *et al.*                    01-3090/3091

preserving rail service whenever possible for the benefit of shippers and the general public, comporting with the need to sustain "a functioning interstate railroad system." *Redmond-Issaquah,* 223 F.3d at 1059. By not requiring acceptance on the part of a qualified OFA purchaser, Congress made clear that the overriding objective was to preserve rail service for shippers over a line that would otherwise be abandoned.

Thus, it is unnecessary for an OFA purchaser, such as CCPA, to file an acceptance of the terms of the sale. Given that CCPA never withdrew its offer to acquire the rail line that RVI wanted to abandon, the sale was binding upon both parties. 49 U.S.C. § 10904(f)(2). Accordingly, the STB had jurisdiction to approve the sale of the rail line.

**2. The STB's October 4, 2000 decision was not erroneous to the extent that it ordered RVI to transfer its entire fee simple interest in property constituting the rail line that was the subject of RVI's exemption petition for abandonment**

RVI next argues that the STB exceeded its jurisdiction under the statute because it ordered RVI to transfer more of its property than was necessary for CCPA to provide effective rail service. While CCPA requested RVI to convey a fee simple interest in all the property comprising the rail line, RVI contends that to conduct effective rail operations CCPA requires no more than a surface fee or easement over the line. In support of its contention that an owner need not transfer all the property comprising the line, RVI relies upon 49 U.S.C. § 10904(f)(1)(B), which provides that when a party to an OFA proceeding asks the STB to set terms, the STB must

> determine the price and other terms of sale, except that in no case shall the Board set a price which is below the fair market value of the line (including, unless otherwise mutually agreed, all facilities on the line or portion necessary to provide effective transportation services).

Nos. 00-3261/3275/3317/     *Railroad Ventures, et al.*    27
4303/4345/4346/4435;       *v. Surface Transp. Bd.,*
01-3090/3091                       *et al.*

value." *Id.* RVI has filed a petition with this Court to review the STB's March 3, 2000 decision.[12]

**3. The STB's October 4, 2000 decision conveying the rail line to CCPA**

CCPA notified the STB on March 20, 2000 that it was prepared to tender payment to RVI, but that it had discovered some inconsistencies between specimen deeds drafted by RVI and the property description used by CCPA's appraiser in valuing the line. CCPA followed this letter with a petition, submitted on March 28, 2000, for a declaratory order from the STB invalidating any post-September 3, 1999 transfers or assignments of property interests from RVI that were not included in CCPA's appraisal report. CCPA specifically expressed concern about RVI's secret conveyances of the line's non-rail crossing, aerial, and subsurface rights to its affiliate VPB in late October and early November of 1999, without informing CCPA or the STB about them. To ensure that it would actually acquire what it purchased, CCPA requested the STB to void "all transfers or assignments of property rights in the railroad property not specifically reflected in CCPA's evidence on the value of the line." (J.A. at 1250.)

Consequently, in a decision issued on April 5, 2000, the STB ordered RVI to show cause why it should not set aside the transfers of subsurface and aerial rights to VPB, and why

---

[12] In the companion case also decided by the STB on March 2, 2000, the STB rejected the petitions of shippers Darlington Brick and Insul to reopen RVI's acquisition decision. These shippers contended that RVI had undertaken certain actions that made restoration of the line more difficult, and that the STB should have more vigorously enforced its own policy with regard to RVI's violations of its common carrier obligations. *R.R. Ventures, Inc. –Acquisition and Operation Exemption –Youngstown & S. R.R. Co.,* STB Finance Docket No. 33385, 2000 WL 24367, at *3 (Service Date Mar. 3, 2000).

the entire property considered in the January 7, 2000 decision should not be transferred to CCPA. *See R.R. Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County, PA,* STB Docket No. AB-556 (Sub-No. 2X), 2000 WL 351356, at *2 (Service Date April 5, 2000). The STB explained that after RVI supplied information about the line to CCPA on October 8, 1999, RVI had a continuing duty to keep CCPA informed of any changes in the information. The STB stated that "[b]y transferring assets after October 8, 1999, and failing to immediately inform the offeror and the STB, RVI has undermined the OFA process." *Id.* at *1. The STB also noted that RVI's proposed quitclaim deeed to convey the 4.2 acre parcel to Boardman Township Park District "directly contravenes our March 3, 2000 decision" and that "RVI may not transfer this parcel to the Park District." *Id.* at *2 n. 2.

RVI responded to the show cause order on April 20, 2000 by claiming that 49 U.S.C. § 10904 required only the sale of a surface easement, denying any intent to convey a fee simple interest in the property. According to RVI, it only intended to "convey an easement for railroad purposes together with all track." Thus, RVI argued that if the STB forced RVI to transfer its entire interest in all the property, including parts that RVI believed were not related to rail service, at a price of $350,000, the STB would commit an unconstitutional taking in violation of the Fifth Amendment. Further, RVI challenged the STB's jurisdiction over "non-rail assets which are not necessary for the provision of rail transportation service," demanding that the STB dismiss its show cause order and issue an order completing the sale.

In support of its position, RVI submitted a verified statement from its president, David Handel, who stated that RVI had informed CCPA of the transfer of subsurface and air rights, third-party agreements, and surface easements at a

regulation is "manifestly contrary to the statute." *Ragsdale,* 122 S. Ct. at 1160. Under the clear terms of § 10904(f)(2), the offeror need not file an acceptance of the STB's decision setting the terms of the sale. Rather, an offeror needs to respond to the STB's decision only in the event that it wants to withdraw its offer to purchase the line. Thus, once an offeror has made an offer to purchase a line being abandoned, and the STB has made a decision setting the terms of the sale, then the sale of the rail line is binding upon both the rail carrier selling the line and the offeror, unless the offeror withdraws its offer within ten days of the STB's decision setting the terms of the sale.

In effect, the position of a prospective OFA purchaser mirrors that of the abandoning rail owner abandoning the line. In a forced sale under § 10904(f)(2), neither the purchaser nor the abandoning rail owner is required to accept the STB's terms of the sale. However, the statute permits an OFA purchaser, but not the abandoning rail owner, to withdraw its offer within ten days of the STB's decision imposing the terms of the sale. Absent a withdrawal on the part of the OFA buyer, the sale is consummated in accordance with the terms imposed by the STB, pursuant to its exclusive and plenary jurisdiction. Thus, the statute imposes, if you will, a "forced acceptance" on the part of the OFA purchaser, unless the buyer takes the affirmative action of withdrawing its offer. Such a "forced acceptance" is the logical counterpart of the forced sale provision of § 10904(f)(2), requiring the abandoning line owner to sell in accordance with the terms of the sale established by the STB.

Here, we construe the absence of any language in the statute requiring a qualified OFA purchaser to accept the terms of the forced sale as signaling Congress' clear intention not to require acceptance on the part of the purchaser. We believe that the omission of language regarding acceptance by an OFA purchaser reflects Congress' overarching goal of

agreed to its sale terms and denied RVI's motions to vacate and to stay the sale of the rail line.

To determine whether the STB had jurisdiction to force RVI to sell the line, we begin by examining the pertinent statutory language. Pursuant to 49 U.S.C. § 10903, the STB has exclusive and plenary jurisdiction over a rail carrier seeking to abandon a rail line. *Preseault,* 494 U.S. at 8 (citing *Kalo Brick,* 450 U.S. at 321); *RLTD Ry. Corp.*, 166 F.3d at 808*;Friends of the Atglen-Susquehanna Trail,* 252 F.3d at 250 n.1. As previously stated, 49 U.S.C. § 10904(f)(2) gives an offeror ten days in which to withdraw the offer to purchase a rail line following a decision of the STB setting the terms of the sale. Without a withdrawal by the offeror, the STB's decision becomes binding on both parties.

While the statute does not impose any requirements or time constraints on the offeror concerning the acceptance of the terms and conditions set by the STB, 49 C.F.R. § 1152.27(h)(7) does require the offeror to accept or reject the STB's terms and conditions within ten days. Specifically, 49 C.F.R. § 1152.27(h)(7) provides:

> Within 10 days of the service date of the Board's decision, the offeror must accept or reject the Board's terms and conditions with a written notification to the Board and all parties to the proceeding.

49 C.F.R. § 1152.27(h)(7).

In this instance, there is a clear conflict between the plain language of the statute and the implementing regulation. The statutory language of § 10904(f)(2) does not require the offeror to "accept" the terms imposed by the STB within a designated period of time, yet the implementing regulation requires the offeror to accept or reject the terms within ten days. Here, we conclude that 49 C.F.R. § 1152.27(h)(7) must give way to 49 U.S.C. § 10904(f)(2) because the

meeting on November 30, 1999. Handel noted that CCPA's appraiser John Rossi, who had filed an earlier verified statement, disclaiming prior knowledge of the transfers of subsurface and aerial rights, was not present at the meeting, and thus had not included the transfers in his appraisal filed in December of 1999. According to Handel, RVI "had consistently maintained throughout this proceeding that subsurface and aerial rights were not part of the interest which RVI was prepared to convey to CCPA for purposes of continued rail operations."

In response to RVI's show cause filing, CCPA denied any knowledge about the conveyance of subsurface or aerial rights prior to March 23, 2000, stating that "a third party" brought the matter to CCPA's attention. CCPA also highlighted that Handel had valued the land for abandonment purposes on the basis of a full fee interest, and that RVI's counsel had, on September 21, 1999, stated that RVI would convey a fee interest in the land. Finally, CCPA stated that an official of Central Columbiana & Pennsylvania Railways, Inc. ("CCPR") had determined that the entire area of land, including noncontiguous parcels, was necessary for rail operations on the line. The official, Timothy Robbins, further explained in a verified statement that RVI had undertaken or authorized the removal of some track and the overpaving of some rail crossings. Another CCPR employee, Walter Gane, provided a verified statement that RVI "has not only allowed the line to deteriorate, but has tacitly approved the destruction of portions of the line, as well as other actions that have caused the line to be inoperable, including paving over multiple roadway crossings." Because the cost of restoring these alterations was estimated to be approximately $335,000, CCPA consequently requested that the STB order RVI to place sufficient funds in escrow to cover the repair costs.

On May 10, 2000, RVI moved the STB to reopen the OFA valuation process on the basis of new evidence concerning the

"highest and best use" of the line. RVI accompanied this motion with a verified statement from Handel, representing that Williams Communications, Inc. ("Williams") had contacted both RVI and CCPA about installing fiber optic cable along the line. Handel stated that this information "validates the contentions of RVI that the highest and best use of its right-of-way is as a non-rail linear corridor." Though RVI claimed that Williams intended to install a fiber optic cable along RVI's right-of-way, RVI admitted that "Williams has not conducted any further negotiations with RVI" after RVI submitted a proposal to it on behalf of VPB.

CCPA also petitioned the STB on May 19, 2000 to reopen the proceedings based on new evidence, having just learned that RVI's former president Ron Hall had previously contracted on November 15, 1996 to sell the salvage right to the line's track and track materials to Kovalchick Corporation ("Kovalchick") for $400,000. The agreement conditioned Kovalchick's right to remove track upon RVI's obtaining abandonment or exemption authority from the STB. In its response to the STB, RVI admitted the sale of the salvage rights to Kovalchick, but contended that the sale was conditional and subject to the STB's abandonment authority.

On October 4, 2000, the STB issued its decision regarding its show cause order and resolved various issues that had arisen since the January 7, 2000 decision setting the terms of the sale. The STB first rejected RVI's argument that, pursuant to 49 U.S.C. § 10904(f)(1), it was only obligated to convey an easement for railroad purposes and rail materials. The STB stated:

> Where (as here) the offeror does not seek to purchase less than the entire property, we believe that it is reasonable to assume that the entire property is needed for effective transportation services. After all, that is the property the selling/abandoning carrier (or its predecessor) assembled for, and dedicated to, rail service.

the statute." *Ragsdale v. Wolverine World Wide, Inc.,* 122 S. Ct. 1155, 1160 (2002) (quoting *Chevron,* 467 U.S. at 844)).

In addition, under the Administrative Procedures Act this Court cannot set aside the STB's decisions, findings, and conclusions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction[;] . . . or unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E); *Film Transit, Inc. v. ICC*, 699 F.2d 298, 300 (6th Cir. 1983). In determining whether a decision by the STB was arbitrary or capricious, this Court must consider whether there was a "rational connection between the facts found and the choice made." *Id*. A decision is not arbitrary or capricious when it is possible to offer a reasoned, evidence-based explanation for a particular outcome. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Perry v. United Food & Comm. Workers Dist. Unions 405 & 442*, 64 F.3d 238, 242 (6th Cir. 1995). In determining whether the STB's findings are supported by substantial evidence, this Court examines whether the STB considered "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion reached." *R.P. Carbone Constr. Co. v. Occupational Safety & Health Review Comm'n*, 166 F.3d 815, 818 (6th Cir. 1999).

**B. Analysis**

**1.   The STB had jurisdiction to approve the sale of the rail line**

On appeal, RVI first contends that the STB lacked jurisdiction to force the sale of the line after the January 7, 2000 and October 4, 2000 decisions because CCPA never properly accepted the STB's terms of sale. Accordingly, RVI urges us to vacate the STB's March 3, 2000 and November 2, 2000 decisions, in which the STB determined that CCPA had

of RVI and VPB's remaining rights in the rail line. *R.R. Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbia Counties, OH, and Beaver County, PA,* STB Docket No. AB-556 (Sub-No. 2X), 2001 WL 1396719, at *4 (Service Date Nov. 9, 2001). In view of RVI's interference with the administration of the escrow fund, the STB further directed CCPA "to manage the funds directly" and "complete all repairs for which the escrow funds are to be used within 270 days from the effective date of this decision." *Id*. at *5.

## II. DISCUSSION

### A. Standard of Review

When asked to review a decision of an administrative agency, this Court employs a narrow standard of review. *See Simms v. Nat'l Traffic Safety Admin.*, 45 F.3d 999, 1003 (6th Cir. 1995). First, this Court "must give considerable weight and due deference to the [STB's] interpretation of the statutes it administers unless its statutory construction is plainly unreasonable." *RLTD Ry. Corp.*, 166 F.3d at 812-13 (quoting *Brotherhood of Locomotive Eng'rs v. ICC*, 909 F.2d 909, 912 (6th Cir. 1990); s*ee generally Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843-45 (1984) (holding that reviewing court must only ask whether agency action "is based on a permissible construction of the statute"). "While an agency's interpretation of a statute is entitled to deference, 'federal courts bear the ultimate responsibility for interpreting federal statutes.'" *Crounse Corp. v. ICC*, 781 F.2d 1176, 1183 (6th Cir. 1986) (quoting *Meade Township v. Andrus*, 695 F.2d 1006 (6th Cir. 1982)). We also note that "[a]n agency's interpretation of its own regulation[s] merit[] even greater deference than its interpretation of the statute that it administers." *Buffalo Crushed Stone, Inc. v. STB*, 194 F.3d 125, 128 (D.C. Cir. 1999). However, a regulation from the agency charged with implementing the statute cannot stand if it is "arbitrary, capricious, or manifestly contrary to

*R.R. Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County, PA,* STB Docket No. AB-556 (Sub-No. 2X), 2000 WL 1470451, at *6 (Service Date Oct. 4, 2000). In reaching this conclusion, the STB imposed a "heavy burden" on the abandoning carrier to rebut the presumption that all the property was necessary for effective rail operations. The STB concluded that RVI failed to sustain this burden, finding that RVI's "assurance" that the property interests that it intended to convey to CCPA would be sufficient to operate the rail line was "entitled to little, if any, weight, considering that RVI has not had any experience operating this, or any other, rail line." *Id*. The STB further reasoned that dividing the surface rights from other property rights in the land would be "impractical and unworkable" and "could create constant tension between the owner of the rail line (here, RVI's affiliate VPB) or other easement holders . . . and the holder of surface rights to conduct rail operations (here, CCPA)." *Id*. Although RVI claimed that there would be no problems between a railroad with surface rights and other parties with subsurface or aerial rights, the STB was

> not persuaded, however, that there can be any assurance that rail operations will be unhampered unless the offeror (who will be responsible for ensuring that rail service is provided) possesses sufficient property rights to determine unimpeded who may enter the right-of-way at what times and under what circumstances, as well as whether any underground or additional overhead cables or similar structures would interfere with its own rail use of the right-of-way.

*Id*. Accordingly, the STB ordered RVI to include in the conveyance to CCPA "all property in the right-of-way, including the subsurface and air rights, all real estate and track, and all other rail materials." *Id*. at *12.

The STB also voided RVI's transfers of subsurface and aerial rights to its affiliate, VPB, and the sale of 4.012 acres to the Park District. Citing *Kalo Brick,* 450 U.S. at 320, the STB held that these transfers violated the STB's "continuing and exclusive regulatory jurisdiction over the rail line prior to its abandonment." *Id*. at *7. According to the STB, RVI's attempted conveyances after the commencement of the OFA process amounted to "a blatant effort to strip away as much of the property as possible to avoid including those portions of the property in the OFA sale." *Id*. The STB further viewed the transfers as "undermin[ing] the OFA sale by jeopardizing CCPA's ability to provide effective, uninterrupted rail service." *Id*. Based upon the need "to protect the integrity of the OFA process," the STB, relying upon its inherent regulatory authority, reaffirmed its order directing that "RVI sell to CCPA all of the interests that it acquired in this rail line with the exception of the licenses and crossings to which CCPA has acquiesced by reducing its assessment of the valuation of the line . . . ." *Id*.

The STB also addressed evidence of RVI's 1996 sale of the track salvage rights to Kovalchick. While CCPA characterized the Kovalchick sale as evincing RVI's clear lack of intention to operate the line and requested revocation of the abandonment exemption on this ground, the STB declined to revoke the exemption, but instead decided to revalue the track and materials in light of the evidence of the sale to Kovalchick. Specifically, the STB explained that RVI had withheld information about the Kovalchick sale during its earlier valuation of the line, "render[ing] meaningless the later offer upon which [the] STB had relied." The STB determined that the net salvage value for the track should be reduced to the $400,000 that Kovalchick had paid for the right to salvage the materials in the future. *Id*. at *8-9.

The STB also refused RVI's request that the STB reopen the line valuation to consider evidence of the line as an

continued rail service." *Id*. at *2. The STB also rejected a request from RVI to include language in the bill of sale conditioning the sale on CCPA's assumption of liability for repair of track fixtures, concluding that this language contravened the STB's order creating an escrow account for RVI's payment of track repairs and restoration. *Id*. at * 3. However, the STB granted a request from RVI to include language in the instruments of conveyance indicating that the transfer to CCPA was subject to future orders and decisions of the STB and this Court.

CCPA then moved this Court for an injunctive order compelling RVI to comply with the STB's decisions and enjoining RVI from collaterally attacking the STB's decision. In an order issued on January 5, 2001, a panel of this Court partially granted CCPA's motion, directing RVI to comply with the October 4, 2000 and December 7, 2000 decisions of the STB requiring the transfer of the rail line to CCPA. This Court remanded the matter to STB "for the limited purpose of specifying the form of the deed and bill of sale to be utilized for the transfer and scheduling a new date for the closing." Pursuant to this Court's January 5, 2001 order, the STB issued a decision on January 17, 2001, rejecting the proposed deeds proffered by RVI, directing the parties to use the proposed deeds proffered by CCPA, as well as its proposed bill of sale, and setting a closing date of January 23, 2001. *R.R. Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County, PA,* STB Docket No. AB-556 (Sub-No. 2X), 2001 WL 41202, at *2-3 (Service Date Jan. 17, 2001).

Thereafter, in May of 2001, CCPA filed a request with the STB seeking clarification of the assets to be transferred to it and the establishment of a procedure for disbursing the funds from the escrow account to pay for repairs to the line. In a decision on November 9, 2001, the STB clarified the extent

corridor.  The STB explained that it had credited all the "convincing evidence" of assembled corridor value, limited to the contract for sale of 21 acres of land to Boardman Township and the earlier sale of an aerial easement to Ohio Edison Company.  The STB refused to credit other corridor valuation evidence because RVI had not presented it in the form of a signed sale agreement or firm purchase offer.  *Id*. at * 6-7.  Finally, the STB reconfirmed its conclusion that the proper track salvage value was limited to $400,000 based upon the 1996 sale to Kovalchick.  The STB explained that "if abandonment had occurred, RVI could not have resold the track and materials to a different company for any price, because it earlier had sold the future salvage rights for $400,000."  *Id*. at *7.  RVI has filed a petition for this Court's review of the STB's November 2, 2000 decision.  By an order dated November 17, 2000, this Court denied RVI's request for a stay pending judicial review.

**5.    The STB's December 7, 2000, January 17, 2001 and November 9, 2001 decisions**

After the STB's November 2, 2000 decision, a number of issues arose between the parties resulting in several more decisions of the STB.  On December 7, 2000, the STB rejected a request from RVI to bind CCPA and its prospective operator, CCPR, to the 1996 "management agreement" between RVI and OLE, Ltd., which required the payment to a property manager of ten percent of the gross receipts from the operation, rent, or transfer of the rail line.  *R.R. Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County, PA,* STB Docket No. AB-556 (Sub-No. 2X), 2000 WL 1801264, at *2-3 (Service Date Dec. 7, 2000).  The STB found that this obligation, costing approximately $137,000, subjected CCPA to unnecessary and burdensome costs, possibly thwarting a sale of the rail line under the OFA process, and was contrary to the primary purpose of 49 U.S.C. § 10904, which is "to provide for

assembled corridor, except for in one limited area, adjusting the value of the land upward somewhat to reflect timely evidence of a contingent sale of 20.6 acres to the Park District for a 4.2 mile bicycle trail,  for which RVI had earlier submitted a signed contract.  Because RVI had a contract to sell its rights on the 4.2 mile segment to the Park District in the event that the line were abandoned, the STB revalued the acreage sold to the Park District at the contract price of $600,000, and revalued the remaining portion of the land within Boardman Township (approximately two acres) at $19,306.  The STB's revaluation of the land thus yielded a total land value of $817,868, from which it subtracted $100,000 for income assigned by RVI to a third party.  The STB added the $717,868 to the new $400,000 track value and reached a total value for the rail line of $1,117,868.  *Id*. at * 10-11.

However, the STB rejected all of RVI's other reasons for revaluing the land as an assembled corridor, concluding that RVI's evidence, which included proposals by other park districts to gain funding for trails on the line and an offer by RVI to sell an easement to Williams for installation of fiber optic cable, was not submitted prior to its setting the land valuation in the January 7, 2000 decision and was "speculative."  The STB explained:

With the exception of the completed sale of an easement to Ohio Edison [that the Board had included in its prior valuation of the land], there is no comparable signed contract for sale of rights for other utility easements on any portion of the right-of-way.  Nor is there a firm bid from a purchaser that would be binding upon RVI's acceptance.

*Id*. at * 9.  The STB also refused to include the 4.012-acre sale to the Park District because RVI had not identified the

location of the parcel, and did not argue that the contract for sale demonstrated the value of the land. *Id*. at * 10.

Finally, the STB discussed CCPA's evidence regarding removal of, or damage to, segments of the line and track. Specifically, the STB responded to correspondence introduced by CCPA that showed that RVI authorized "state road crews [to] pave over the line while it was still an active rail line and at the same time that shippers were requesting service." Because the STB found that RVI acted in "blatant disregard of its common carrier obligations to provide service," it acceded to CCPA's request to establish an escrow account for funding "to ensure that RVI pays for uncovering and restoring paved-over track and for reconnecting signal equipment at road crossings." *Id*. at * 11. The STB accordingly directed that $375,000 of the sale price be placed into an escrow account, and ordered RVI to permit CCPA and its agents to inspect the line for damage. The STB then ordered RVI to convey to "CCPA all land, track, and related material, and property interests covered by [its] previous order, as clarified here, within 45 days of the date of service of this decision according to the terms of closing stated in this decision." *Id*. at * 12. RVI, Boardman Township, and the Park District have filed petitions for review from the STB's October 4, 2000 decision.

### 4. The STB's November 2, 2000 decision denying RVI's motions to vacate and to stay the sale

After the STB's October 4, 2000 decision, RVI filed a motion to vacate the sale and vacate postponement of the abandonment exemption on the grounds that CCPA had not timely accepted the STB's new sale terms. RVI also requested a stay of the sale pending review by this Court. CCPA responded to this motion with a letter to the STB dated October 20, 2000, advising both the STB and RVI that "it accepts the revised terms and conditions."

The STB then issued a decision on November 2, 2000, denying RVI's motions to vacate and to stay the sale. *R.R. Ventures, Inc. – Abandonment Exemption – Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County, PA,* STB Docket No. AB-556 (Sub-No. 2X), 2000 WL 1648143 (Service Date Nov. 2, 2000). The STB explained that pursuant to 49 U.S.C. § 10904(f)(2), an offeror, such as CCPA, is obligated to file a notice of withdrawal from a sale within ten days of a STB decision setting terms, but it is not statutorily obligated to file a notice of acceptance. The STB also rejected RVI's argument that CCPA had failed to comply with the ten-day period for accepting or rejecting in writing the STB's terms pursuant to 49 C.F.R. § 1152.27(h)(7). According to the STB, CCPA had provided proper written notice when the STB set the initial sale terms on January 7, 2000, and thus had complied with the regulation because the STB had not required another notice of CCPA's acceptance of its October 3, 2000 decision. The STB further rejected RVI's motion to vacate in light of CCPA's October 20, 2000 letter of acceptance. *Id*. at * 3-4.

The STB also denied RVI's motion for a stay pending judicial review of the October 3, 2000 decision. The STB first rejected RVI's argument that CCPA had not properly accepted the January terms of the sale. RVI again advanced the argument that the STB could only force an owner to sell as much property as necessary for rail operations, and that CCPA's acceptance of a fee interest was greater than the STB's terms. The STB reiterated its "rebuttable presumption" that a purchaser would need all of the seller's interests "to provide effective transportation service because that is the property the seller (or its predecessor) assembled for, and dedicated to, rail service," concluding that CCPA would need all of RVI's interest in the line. *Id*. at * 5-6.

The STB also rejected RVI's contention that the STB had ignored evidence of non-rail use of the line as an assembled